No. 2014-5060

============================================================

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

————————

PRAIRIE COUNTY, MONTANA, GREENLEE
COUNTY, ARIZONA,
Plaintiffs -Appellants,

v.

UNITED STATES,
Defendant-Appellee.

————————

APPEAL FROM THE UNITED STATES COURT OF
FEDERAL CLAIMS IN CASE NO. 1:12-cv-00625-MMS
JUDGE MARGARET M. SWEENEY

————————

PLAINTIFFS-APPELLANTS' INITIAL BRIEF

————————

ALAN I. SALTMAN
EVANGELIN LEE NICHOLS
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
(202) 452-2140
(202) 775-8217 – fax
email: AISaltman@smithcurrie.com
email: ELNichols@smithcurrie.com

CHARLES W. SURASKY
SMITH, CURRIE & HANCOCK LLP
245 Peachtree Center Avenue NE
2700 Marquis One Tower
Atlanta, GA  30303-1227
(404) 582-8022
(404) 688-0671 – facsimile
email: CWSurasky@smithcurrie.com

Counsel for Plaintiffs-Appellants

Dated:  June 20, 2014

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Prairie County, Montana et al. _____ v. United States _____

No. 14-5060 _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellants _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Prairie County, Montana and Greenlee County, Arizona

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

_____

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Alan I. Saltman, Charles W. Surasky, and Evangelin Lee Nichols.

_____

April 1, 2014 _____                    s/ Alan I. Saltman _____
            Date                                    Signature of counsel

                                         Alan I. Saltman _____
                                          Printed name of counsel

Please Note: All questions must be answered
cc: Sharon A. Snyder _____

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ..................................................................................iv

STATEMENT OF RELATED CASES ....................................................x

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE ................................................................2

STATEMENT OF THE FACTS .............................................................4

SUMMARY OF THE ARGUMENT ......................................................9

ARGUMENT ......................................................................................10

     A.    Standard Of Review .........................................................10

     B.    In Both FY 2006 And FY 2007, A Valid And Binding Obligation Was Created With Respect To Each County But Not Fulfilled; Appellants Are Thus Entitled to Damages .........................................11

          1.    "Subject To The Availability Of Appropriations" Means That A Putative Multi-Year Obligation Funded By Annual Appropriation Is Binding For A Given Year When Congress Appropriates Money To Cover It .................................................11

          2.    Once Created, A Valid And Binding Obligation Of The United States To Pay Money Does Not Terminate When Money In The Appropriation Account From Which Payment Was To Be Made Is Exhausted ...........................................................14

i

C.    Contrary To The Finding Of The COFC, The Supreme Court's Holding In *Cherokee Nation* And *Ramah* As To The Import of "Subject To The Availability Of Appropriations" Language Is Not Somehow Trumped By The Holding Of This Court In *Greenlee County* ...........................................................28

    1.    The View Of The Supreme Court As To The Import Of "Subject To The Availability Of Appropriations" Language Is A Reiteration Of Its Holding In *Leiter* And Is Binding.......................................28

    2.    Other Binding Precedent Of This Court Provides That There Is No Distinction In The Legal Import Of "Subject To The Availability Of Appropriations" Language Based On Whether The Relevant Underlying Obligation Was Created By An Agency Through Contract Or By Congress' Creating A Statutory Benefits Program Or Other Duty To Pay Money .....................................................................................30

    3.    In Any Event, Any Notion That "Subject To The Availability Of Appropriations" Language Has A Different Import With Regard To Obligations Created In A Statutory Benefits Program Is Not Well Founded..........................................................................35

D.    Because *Greenlee County* Is Not A Controlling Precedent And The Court Is Bound By *Ramah* And *Eastern Paralyzed Veterans*, Issue Preclusion Does Not Apply To Appellant Greenlee County's Claim In This Action.............................................39

CONCLUSION ......................................................................................41

Addendum

Certificate of Service

Certificate of Compliance

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Adair v. United States*,
    497 F.3d 1244 (Fed. Cir. 2007) ....................................................................10

*Am. Tradition P'ship, Inc. v. Bullock*,
    132 S. Ct. 1307 (2012)....................................................................................29

*Arctic Slope Native Assoc., Ltd. v. Sebelius*,
    __ U.S. __, 133 S. Ct. 22 (June 25, 2012) ....................................................21

*Arctic Slope Native Ass'n, Ltd. v. Sebelius*,
    629 F.3d 1296 (Fed. Cir. 2010) .............................................15, 17, 20, 21, 26

*Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*,
    269 F.3d 1112 (D.C. Cir. 2001).....................................................................25

*Babbitt v. Oglala Sioux Tribal Public Safety Dep't.*,
    194 F.3d 1374 (Fed. Cir. 1999) ...................................................15, 20, 32, 36

*Bingaman v. Dep't of the Treasury*,
    127 F.3d 1431 (Fed. Cir. 1997) .....................................................................39

*Blackhawk Heating & Plumbing Co. v. United States*,
    622 F.2d 539 (1980) .......................................................................................26

*Cherokee Nation of Ok. v. Leavitt*,
    543 U.S. 631 (2005)..............................................................................*passim*

*Cherokee National of Oklahoma v. Thompson*,
    311 F.3d 1054 (10th Cir. 2002), *rev'd sub nom. Cherokee*
    *Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005) and
    *mandate recalled, opinion vacated sub nom. Cherokee Nation*
    *of Oklahoma v. Leavitt*, 404 F.3d 1263 (10th Cir. 2005) .............................20

*Delta Data Sys. Corp. v. Webster,*
    744 F.2d 197 (D.C. Cir. 1984)......................................................25

*Eastern Paralyzed Veterans Ass'n, Inc. v. Secretary*
    *of Veterans Affairs*, 257 F.3d 1352 (Fed. Cir. 2001)............15, 20, 31, 32, 33

*Entergy Nuclear Fitzpatrick, LLC v. United States,*
    101 Fed. Cl. 464 (2011)...........................................................34

*Ferris v. United States,*
    27 Ct. Cl. 542 (1892) ......................................................18, 26, 27

*Greenlee County v. United States,*
    487 F.3d 871 (Fed. Cir. 2007), *reh'g and reh'g en banc denied*
    Aug. 23, 2007, *cert. denied*, 552 U.S. 1142 (2008) .............................*passim*

*Harper v. Virginia Dept. of Taxation,*
    509 U.S. 86 (1993)...............................................................30

*Hearts Bluff Game Ranch, Inc. v. United States,*
    669 F.3d 1326 (Fed. Cir. 2012) ....................................................10

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.,*
    687 F.3d 1300 (Fed. Cir. 2012), *cert. granted*, No. 12-1163,
    2013 WL 1217353 (U.S. Oct. 2, 2013) ...........................................34

*Johnston v. IVAC Corp.,*
    885 F.2d 1574 (Fed. Cir. 1989) ....................................................34

*Kam-Almaz v. United States,*
    682 F.3d 1364 (Fed. Cir. 2012) ....................................................10

*Lawrence County v. Lead-Deadwood School District No. 40-1,*
    469 U.S. 256 (1985)......................................................3, 6, 28, 37

*Leiter v. United States,*
    271 U.S. 204 (1926)...................................................9, 12, 16, 29

*Lincoln v. Vigil*,
  508 U.S. 187, 113 S. Ct. 2024, 124 L.Ed.2d 101 (1993) ..............................25

*New York Airways, Inc. v. United States*,
  369 F.2d 743 (Ct. Cl. 1966)..................................................18, 28

*New York Cent. R.R. Co. v. United States*,
  65 Ct. Cl. 115 (1928) ....................................................36

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
  864 F.2d 757 (Fed. Cir. 1988) .............................................34

*Prairie County v. United States*,
  113 Fed. Cl. 194 (Oct. 29, 2013)..........................3, 21, 28, 37, 39

*Ramah Navajo Chapter v. Salazar*,
  644 F.3d 1054 (10th Cir. 2011) ...........................................21

*Ramah Navajo School Bd., Inc. v. Babbitt*,
  87 F.3d 1338 (D.C. Cir. 1996)..........................................15, 20

*Salazar v. Ramah Navajo Chapter*,
  567 U.S. __, 132 S. Ct. 995 (Jan. 6, 2012) ...........................*passim*

*Samish Indian Nation v. United States*,
  419 F.3d 1355 (Fed. Cir. 2005) ...........................................11

*Seatrain Lines, Inc. v. United States*,
  99 Ct. Cl. 272 (1943) ....................................................32

*Shoshone-Bannock Tribes of Fort Hall Reservation v. Sec'y Dep't
  of Health & Human Servs.*, 279 F.3d 660 (9th Cir. 2002) ..................20

*Star-Glo Assocs., LP v. United States*,
  414 F.3d 1349 (Fed. Cir. 2005) .............................33, 35, 38, 40

*Strickland v. United States*,
   423 F.3d 1335 (Fed. Cir. 2005) ..................................................................37

*Thompson v. Cherokee Nation of Oklahoma*,
   334 F.3d 1075 (Fed. Cir. 2003), *aff'd and remanded sub nom.*
   *Cherokee National of Oklahoma v. Leavitt*, 543 U.S. 631 (2005) ...............25

*United States v. Langston*,
   118 U.S. 389 (1886)......................................................................................18

*United States v. White Mountain Apache Tribe*,
   537 U.S. 465 (2003)................................................................................14, 19

*W. Co. of N. Am. v. United States*,
   323 F.3d 1024 (Fed. Cir. 2003) ..................................................................10

*Wetsel-Oviatt Lumber Co., Inc. v. United States*,
   38 Fed. Cl. 563 (Fed. Cl. 1997) ..................................................................18

## STATUTES AND REGULATIONS

28 U.S.C. § 1295(a)(3) (2011) .................................................................................1

28 U.S.C. § 1491 .....................................................................................................14

28 U.S.C. § 1491(a)(1) (2011) .................................................................................1

31 U.S.C. § 1341(a)(1)(A), (B) ..............................................................................17

31 U.S.C. § 6901 .......................................................................................................6

31 U.S.C. § 6902(a)(1)..........................................................................................7, 11

31 U.S.C. § 6903 .................................................................................................8, 19

31 U.S.C. § 6903(b)(1)(A) .......................................................................................6

vii

31 U.S.C. § 6903(b)(1)(B) ..................................................................6

31 U.S.C. § 6906 ...............................................................7, 12, 16

38 U.S.C. § 1710 ...............................................................................32

RCFC 12(b)(6) ..............................................................................3, 10

RCFC 23 ...............................................................................................2

RCFC 59 ...............................................................................................1

## MISCELLANEOUS

39 Comp. Gen 340 (1959) ...............................................................22

B-239435, Aug. 24, 1990 ....................................................12, 13, 29

GAO, A GLOSSARY OF TERMS USED IN THE FEDERAL BUDGET PROCESS
   57 (3rd ed. 1981)..........................................................................36

GAO, A GLOSSARY OF TERMS USED IN THE FEDERAL BUDGET PROCESS
   70 (5th ed. 2005)...................................................................16, 17

GAO Redbook (3rd ed. 2006).........................................12, 17, 25, 27, 29

GAO Redbook, ANNUAL UPDATE OF THE THIRD EDITION
   (March 2014) ........................................................................17, 26

Pub. L. No. 94-565, 90 Stat. 2662, presently codified at 31 U.S.C.
   §§ 6901-6907 ..........................................................................2, 4, 8

Pub. L. No. 104-262, § 104, codified at 38 U.S.C. § 1704 *et seq.* .........31

Pub. L. No. 109-54 (August 2, 2005) ...................................................8

Pub. L. No. 110-343, amended October 3, 2008 ...................................7, 12

Pub. L. No. 112-141 (July 6, 2012) ...................................................7, 12

Pub. L. No. 113-79 (Feb. 7, 2014 .............................................................7

Revised Continuing Appropriations Resolution for FY2007,
      Pub. L. No. 110-5 (Feb. 15, 2007)...................................................8

S. Rep. No. 94-1262 (1976), reprinted in 1976 U.S.C.C.A.N.
      5968 ........................................................................................4, 5, 6

Proceedings and Debates on the 110th Congress, First Session,
      153 Cong. Rec. S3986-04 (Mar. 28, 2007) ....................................37

Lloyd B. Miller, *A Most Unusual Alliance:  Indian Tribes and Military*
      *Contractors Vindicate First Principles in the Ramah Litigation*,
      Fed. Law., October/November 2012 ............................................22

Demographics, http://www.co.greenlee.az.us/demographics.aspx (last accessed
      June 16, 2014)...................................................................................7

Prairie County Road Policies,
      http://visitterrymt.com/website/PCC/images/doc/ROADPOLICYMANUAL
12412.pdf  (last accessed June 16, 2014)..............................................7

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding has previously been before this or any other appellate court.

**JURISDICTIONAL STATEMENT**

The United States Court of Federal Claims ("COFC") had jurisdiction under the Tucker Act. 28 U.S.C. § 1491(a)(1) (2011). The COFC issued an Opinion and Order on October 29, 2013, and entered final judgment on October 30, 2013 in favor of Defendant-Appellee dismissing Plaintiffs-Appellants' Complaint for failure to state a claim upon which relief could be granted.

On January 14, 2014, the COFC denied Plaintiffs-Appellants' Motion for Reconsideration filed pursuant to Rule 59 of the United States Court of Federal Claims ("RCFC"). On March 14, 2014, Prairie County, Montana and Greenlee County, Arizona filed a timely notice of appeal from that final judgment. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3) (2011).

**STATEMENT OF THE ISSUES**

1. Did the COFC err in failing to recognize that the Supreme Court had rejected the Federal Circuit's interpretation of "subject to the availability of appropriations" language as it had been used in *Greenlee County v. United States* and other cases?

2. Did a tentative statutorily-created legal obligation, to make a specified payment to an eligible county subject to the availability of appropriations, become valid and binding upon Congress' appropriation of sufficient money to cover it?

3. Did the COFC err in holding that "subject to the availability of appropriations" language has the meaning set forth in *Salazar v. Ramah* with

1

regard to contractually-created obligations, but another meaning with regard to the statutory obligations created by the Payment in Lieu of Taxes Act?

4. Did the COFC err, by failing to recognize that *Ramah* (and *Cherokee Nation v. Leavitt*) worked a change in the applicable law, in holding that the issue preclusion doctrine applied to Appellant Greenlee County?

## STATEMENT OF THE CASE

On September 27, 2012, Prairie County, Montana and Greenlee County, Arizona filed suit in the COFC on behalf of themselves and all counties similarly situated, seeking the balance of the payments due them in FYs 2006-07 under the Payment in Lieu of Taxes ("PILT") Act, presently codified at 31 U.S.C. §§ 6901-6907. The Complaint asked that the COFC certify the case as a class action under RCFC 23. The Counties asserted that in two recent cases, *Cherokee Nation of Ok. v. Leavitt*, 543 U.S. 631 (2005), and *Salazar v. Ramah Navajo Chapter et. al.*, 567 U.S. __, 132 S. Ct. 2181 (Jan. 6, 2012), the Supreme Court had (a) reiterated its view that making an obligation "subject to the availability of appropriations" relates to whether a valid and binding obligation comes into being upon Congress' enactment of a appropriation to cover the particular obligation to the plaintiff regarding which suit had been brought, and (b) rejected this Court's long-held position that such language simply means that government's total annual liability

2

with regard to the relevant program (or all program-related contracts) is limited to the amount appropriated by Congress for the program for the year in issue.

The government moved to dismiss the case pursuant to Rule 12(b)(6) of the RCFC for failure to state a claim upon which relief can be granted. A response was filed on January 2, 2013 and the briefing was completed on February 21, 2013 upon the government's filing its reply. The Counties requested oral argument by Motion dated April 12, 2013.

In an opinion dated October 28, 2013, the COFC granted the government's motion and stated that oral argument was unnecessary. *See Prairie County v. United States*, 113 Fed. Cl. 194 (Oct. 29, 2013). Addendum ("Add.") at 1. The COFC also rejected Greenlee County's arguments that issue preclusion did not apply to bar its claims, concluding that the same issues regarding PILT payment deficiencies had been litigated in *Greenlee County v. United States*, 487 F.3d 871 (Fed. Cir. 2007), *reh'g and reh'g en banc denied* Aug. 23, 2007, *cert. denied*, 552 U.S. 1142 (2008).

Believing that the premise on which the COFC relied was fallacious and inconsistent with the holdings of the Supreme Court in *Ramah, Cherokee Nation,* and *Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 456 (1985), as well as binding precedent of this Circuit, the Counties sought

3

reconsideration.  After requesting and receiving a response from the government, the COFC denied the motion for reconsideration.  Add.12-13.

On March 14, 2014, a timely appeal from the COFC's decision was filed.

**STATEMENT OF FACTS**

In 1976, Congress enacted the Payment in Lieu of Taxes Act, Pub. L. No. 94-565, 90 Stat. 2662, presently codified at 31 U.S.C. §§ 6901-6907. *See* Complaint ("Compl.") at ¶ 5. The Act was passed in response to a comprehensive review by the Public Land Law Review Commission of the policies applicable to the use, management, and disposition of federal lands.  S. Rep. No. 94-1262, 5-6 (1976), *reprinted in* 1976 U.S.C.A.A.N. 5968-69.

The federal government had for many years been providing payments to partially compensate state and local governments for revenues lost as a result of the presence of tax-exempt federal lands within their borders.  Compl. ¶¶ 8-10.  Those payments were in the form of shared receipts from oil and gas leasing, mining, timber sales, and grazing on federal lands located within a local government's boundaries.  *See* S. Rep. No. 94-1262, at 7-8, *reprinted in* 1976 U.S.C.A.A.N. at 5969-71.  The Public Land Law Review Commission and Congress had identified a number of flaws in the then-existing system.  S. Rep. No. 94-1262, at 7-10, *reprinted in* 1976 U.S.C.A.A.N. at 5971-73.  Prominent among congressional

4

concerns was that, under the shared receipts approach, the amounts received by a

local government could, and often did, vary substantially from year to year.

S. Rep. No. 94-1262 at 8, *reprinted in* 1976 U.S.C.A.A.N. at 5971 ("Even once a

level of production is established, State and local governments cannot budget

public lands revenue and fee sharing funds with any degree of certainty, because

management decisions of the various [f]ederal land management agencies can

often quite suddenly reduce or eliminate the revenue or fee generating activities on

the public lands within those State or local governments' jurisdictions").  As a

result, a local government often received an amount that was insufficient to cover

the full cost of providing services related to the federal lands within its

jurisdictions.  S. Rep. No. 94-1262, at 9-10, *reprinted in* 1976 U.S.C.A.A.N. at

5972-73; Compl. ¶ 9.

Where these lands consisted of wilderness or park areas, they attracted

thousands of visitors each year.  S. Rep. No. 94-1262, at 13, *reprinted in* 1976

U.S.C.A.A.N. at 5976. While state governments might benefit from this federally

inspired tourism through the collection of income or sales taxes, such revenues did

not accrue to local governments restricted to raising revenue from property taxes.

S. Rep. No. 94-1262, at 8-9, *reprinted in* 1976 U.S.C.A.A.N. at 5971-72.  "Yet, it

was the local governments that bore the brunt of the expenses associated with the

federal lands [located within their borders], such as law enforcement, road maintenance, and the provision of public health services." *Lawrence County*, 469 U.S. at 262-63.

PILT was designed to assure that these "units of general local government"[1] received an adequate and predictable level of federal funds annually by providing that each eligible unit of general local government is to receive either: (1) a specified amount from various enumerated federal revenue-sharing laws, supplemented, as necessary, by a payment pursuant to PILT, 31 U.S.C. § 6903(b)(1)(A),[2] or (2) simply a payment per acre of federal land pursuant to PILT, 31 U.S.C. § 6903(b)(1)(B), *see* Add.15; Compl. ¶¶ 25-32. Thus, PILT functions as an insurance policy of sorts, insuring that the federal government annually provides a local government with at least the amount specified by formula even if there is a shortfall in funds from the specified federal sources. *See* S. Rep. 94-1262, at 6, *reprinted in* 1976 U.S.C.A.A.N. at 5969.

---

[1] 31 U.S.C. § 6901 defines "unit of general local government" generally to include counties and other units of general local government that the Secretary of the Interior, in his discretion, determines to be the principal provider of governmental services. Compl. ¶ 22.

[2] *See* S. Rep. No. 94-1262, at 8, *reprinted in* 1976 U.S.C.A.A.N. at 5971.

The PILT Act provides that "[t]he Secretary of the Interior shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located, as set forth in this chapter." 31 U.S.C. § 6902(a)(1), Add.14. At all times relevant to this litigation, the PILT Act also provided that: "Necessary amounts may be appropriated to the Secretary of the Interior to carry out this chapter. Amounts are available only as provided in appropriation laws."[3]

Prairie County, Montana has a population of 1,179, and 40% of its land base is owned by the Federal Government.[4] Greenlee County, Arizona has a population of 8,605 and 77% of its land base is owned by the Federal Government.[5]

The Secretary has determined that each of the Appellants involved in this case is a "unit of general local government in which entitlement land is located" within the meaning of the PILT Act. Compl. ¶¶ 4, 24. As such, the Secretary has

---

[3]This language was amended on October 3, 2008, by Pub. L. No. 110-343 to read as follows: "[f]or each fiscal years 2008-2012 . . . (2) sums shall be made available to the Secretary of the Interior for obligation or expenditure in accordance with this chapter." 31 U.S.C. § 6906. The date was extended from 2012 to 2013 by Pub. L. No. 112-141 (July 6, 2012) and from 2013 to 2014 by Pub. L. No. 113-79 (Feb. 7, 2014).

[4]*See* Prairie County Road Policies at p. 2 http://visitterrymt.com/website/PCC/images/doc/ROADPOLICYMANUAL12412.pdf (last accessed June 16, 2014).

[5]*See* Demographics, http://www.co.greenlee.az.us/demographics.aspx (last accessed June 16, 2014).

7

made PILT payments to Prairie County and Greenlee County each year since the PILT Act was enacted.  Compl. ¶¶ 4, 21, 24-25.

In fiscal years 1998 through 2007, the total amount appropriated annually by Congress for PILT proved insufficient to permit the Secretary of the Interior to make payment to all eligible local governments in the full amount specified by the formula in § 6903 of the PILT Act.  Compl. ¶¶ 34-35. As a result, in each year the Secretary paid Prairie County and Greenlee County (and other similarly situated local governments) only a pro-rata share of the amount to which each was entitled. Compl. ¶ 35.

With regard to the two fiscal years here in issue, FY 2006 and FY 2007, the relevant appropriation acts provided:

> For expenses necessary to implement the Act of October 20, 1976, as amended (31 U.S.C. §§ 6901-6907), $236,000,000 of which not to exceed $400,000 shall be available for administrative expenses.

Pub. L. No. 109-54 (Aug. 2, 2005); *see also* Revised Continuing Appropriations Resolution for FY 2007, Pub. L. No. 110-5 (Feb. 15, 2007).

In FY 2006, the amount to which Prairie County was entitled under § 6903 of the PILT Act was $128,846, but it was only paid $86,912.  *See* Compl. ¶¶ 11, 14, 17, 48, 51, 54.  In FY 2007, the amount to which it was entitled under § 6903 was $133,140; it was only paid $86,149.  *See id.*  Greenlee County was entitled to

$398,996 for FY 2006, but was paid only $269,139; for FY 2007, it was entitled to $582,314, but was paid only $376,788. *See* Compl. ¶¶ 12, 15, 18, 49, 52, 55.

## SUMMARY OF THE ARGUMENT

The PILT Act requires the Secretary of the Interior to "make a payment for each fiscal year" pursuant to a formula set forth in the statute to each eligible unit of local government. At all times relevant, this putative multi-year obligation to pay money to an intended recipient was both subject to the availability of appropriations *and* funded by annual appropriations.

This and other courts have held that a payment obligation of the United States which is "subject to the availability of appropriations" means that the government's total liability for all payments to be made from a lump sum appropriation account relating to the program is limited to the amount appropriated by Congress, *i.e.*, that the obligation of the United States to make payments ceases when the funds in the relevant appropriation account is exhausted. This interpretation was, however, rejected by the Supreme Court in *Cherokee Nation* and *Ramah,* in which the Court reiterated the position set out in *Leiter v. United States*, 271 U.S. 204 (1926), that in the case of a putative multi-year, annually funded, obligation to pay money to a designated recipient, making that obligation "subject to the availability of appropriations" simply means that the

9

obligation for any fiscal year does not become valid and binding on the United States unless and until Congress appropriates funds to cover it.

Once that occurs, as it did here both with regard to Prairie and Greenlee Counties, the obligation becomes valid and binding on the United States. As with any binding obligation, while the subsequent exhaustion of funds in the lump sum appropriation account from which the payment was intended to be made prevents the accounting officers of the government from making further payments, the obligation remains fully enforceable in court by the obligee.

## ARGUMENT

### A.     Standard of Review

The Federal Circuit reviews *de novo* a decision to dismiss a complaint for failure to state a claim under RCFC 12(b)(6). *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012), *citing Hearts Bluff Game Ranch, Inc. v. United States,* 669 F.3d 1326, 1328 (Fed. Cir. 2012).

In such circumstances, the Federal Circuit also reviews without deference the COFC's interpretation of statutes and its RCFC 12(b)(6) analysis, and views the facts alleged as true. *Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007), *citing W. Co. of N. Am. v. United States*, 323 F.3d 1024, 1029 (Fed. Cir.

2003); *Samish Indian Nation v. United States*, 419 F.3d 1355, 1363-64 (Fed. Cir.

2005).

>    **B.    In Both FY 2006 and FY 2007, A Valid And Binding Obligation Was Created With Respect To Each County But Not Fulfilled; Appellants Are Thus Entitled To Damages**

>        **1.    "Subject To The Availability Of Appropriations" Means That A Putative Multi-Year Obligation Funded By Annual Appropriation Is Binding For A Given Year When Congress Appropriates Money To Cover It**

The PILT Act provides that "[t]he Secretary of the Interior shall make a

payment for each fiscal year to each unit of general local government in which

entitlement land is located, as set forth in this chapter." 31 U.S.C.§ 6902(a)(1),

*see* Add.14. As noted, Prairie County and Greenlee County are units of general

local government in which entitlement land is located. Indeed, a large portion of

the land in both Prairie and Greenlee Counties is owned by the Federal

Government.[6]

At all times relevant, PILT was funded by annual appropriation and the

PILT Act provided that: "Necessary amounts may be appropriated to the Secretary

of the Interior to carry out this chapter. Amounts are available only as provided in

---

[6]*See supra* n.4 and n.5.

11

appropriation laws." 31 U.S.C. § 6906,[7] Add.18. In *Greenlee County*, this Court held that the "available only as provided in appropriations laws" language of the PILT Act was the functional equivalent of "subject to the availability of appropriations." 487 F.3d at 878.

Where the United States has such a putative multi-year obligation that is funded by annual appropriations and is "subject to the availability of appropriations," the obligation to pay an individual recipient in any given year becomes binding on the United States only if and when Congress appropriates money to cover it. *Leiter v. United States,* 271 U.S. 204 (1926); GAO Redbook at 6-52 (3d. ed. 2006), Add.26; B-239435, Aug. 24, 1990, Add.32-36.

The Supreme Court reiterated this view that "subject to the availability of appropriations" language relates to whether a binding obligation came into being for the years in issue in two recent cases *Cherokee Nation* and *Ramah*. In doing so, the Supreme Court rejected this Court's long-held position that "subject to the availability of appropriations" language means that the government's liability

---

[7]This language was subsequently amended by Pub. L. No. 110-343 to read as follows: "[f]or each fiscal years 2008-2012 . . . (2) sums shall be made available to the Secretary of the Interior for obligation or expenditure in accordance with this chapter." The date was extended from 2012 to 2013 by Pub. L. No. 112-141 (July 6, 2012).

under the relevant program is limited to the total amount appropriated by Congress for the program for the year. *Cherokee Nation,* 543 U.S. at 637, and *Ramah,* 132 S. Ct. at 2184, both held that the "subject to the availability of appropriations" condition is satisfied, with respect to any individual obligee, when Congress appropriates sufficient funds to pay that obligee in full – even if the total lump sum appropriation proves inadequate to pay all program obligations. *Ramah*, 132 S. Ct. at 2190; *Cherokee Nation*, 543 U.S. at 646-47.

Here, the COFC's conclusion that the "subject to the availability of appropriations" language in the PILT Act means that the United States' total liability both in FY 2006 and FY 2007 was limited to the lump sum amount appropriated by Congress for PILT in each respective fiscal year is at odds with *Ramah*, *Cherokee Nation*, *Leiter*, and B-239435.

A valid and binding obligation of the United States, to pay Prairie County the amount provided for in the PILT Act, came into being when Congress appropriated sufficient money to cover that amount for FY 2006.  For the same

reason a similar obligation became valid and binding for FY 2007. The same is true with respect to Greenlee County.[8]

The COFC erred in dismissing the Counties' Complaint seeking damages resulting from the failure of the United States to fulfill each respective binding obligation.

>    **2.    Once Created, A Valid And Binding Obligation Of The United States To Pay Money Does Not Terminate When Money In The Appropriation Account From Which Payment Was To Be Made Is Exhausted**

The United States can create a legal obligation to pay money to one of its citizens by statute or by contract. If the government fails to fulfill an obligation created by statute, the citizen can bring suit upon the statute if it is "reasonably amenable to the reading that it mandates a right of recovery in damages." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472-73 (2003). Suit can be brought to enforce a statutory obligation to the same extent it can be brought to enforce a contractual obligation. 28 U.S.C. § 1491.

This Court has held that if an obligation created by the PILT Act is not fulfilled, a local government to whom payment was promised can bring suit for the

---

[8]The annual lump sum PILT appropriation was $236,000,000 for each of fiscal years 2006 and 2007 – more than enough to pay Prairie County the $128,846 due it in 2006 and the $133,140 due it in 2007, and to pay Greenlee County $398,996 in 2006 and $582,314 in 2007.

recovery of damages. *Greenlee County*, 487 F.3d at 871. Stated differently, the PILT Act is a money-mandating statute. *Id.* Here, Prairie County and Greenlee County seek damages for the failure of the United States, in FY 2006 and FY 2007, to make the full payments to them specified by the PILT Act.

In *Greenlee County*, this Court held – just as it had with regard to similarly conditioned obligations created in contract-based programs[9] – that under the PILT Act the government's duty to make payments to any county ceased upon the exhaustion of funds in the relevant appropriation account. *Greenlee County*, 487 F.3d at 878. However, as the Supreme Court explained in *Cherokee Nation* and *Ramah*, all that "subject to the availability of appropriations" language does – particularly in the context of a putative multi-year obligation that is annually funded – is "make[ ]clear" that the legal obligation of the United States to make an annual payment "will not become binding unless and until Congress appropriates

---

[9]*Babbitt v. Oglala Sioux Tribal Public Safety Dep't*, 194 F.3d 1374, 1378 (Fed. Cir. 1999); *Eastern Paralyzed Veterans Ass'n, Inc. v. Secretary of Veterans Affairs*, 257 F.3d 1352, 1362-1363 (Fed. Cir. 2001). *See also Arctic Slope Native Ass'n., Ltd v. Sebelius*, 629 F.3d 1296, 1304 (Fed. Cir. 2010) ("The availability of funds provision coupled with the 'not to exceed' language limits the Secretary's obligation to the tribes to the appropriated amount. The Secretary is obligated to pay no more than the statute appropriates," *citing Oglala Sioux*, 194 F.3d at 1378; *Ramah Navajo School Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1345 (D.C. Cir. 1996)).

funds for that year." *Cherokee Nation*, 543 U.S. at 643 (other citations omitted); *Ramah*, 132 S. Ct. at 2189.[10]  *Accord Leiter*, 271 U.S. 204.[11]  Like virtually every term used in appropriation law, "subject to the availability of appropriations" is a term of art.

Here, the COFC failed to recognize that in *Ramah* and *Cherokee Nation* the Supreme Court had reiterated that the legal import of "subject to the availability of appropriations" language is different than the long-held view of this Circuit as articulated in numerous cases including *Greenlee County*.  For this reason the COFC was erroneous in concluding that *Greenlee County* was binding precedent.

In *Greenlee County*, this Court held that because of the functional equivalency of § 6906 and language conditioning the government's obligation on the "availability of appropriations," the government's *total* annual liability under PILT was limited to the *total* amount appropriated by Congress for that fiscal

---

[10]*See also* GAO, A GLOSSARY OF TERMS USED IN THE FEDERAL BUDGET PROCESS 70 (5th ed. 2005), Add.22.

[11]In *Ramah*, the Supreme Court found that the tentative obligation that was subject to the availability of appropriation there became binding on the United States once Congress appropriated sufficient legally unrestricted funds to cover the obligation.  *Ramah*, 132 S. Ct. at 2189.

16

year.[12] *Greenlee County*, 487 F.3d at 878.[13] However, as GAO has stated, where an obligation is valid and binding "if the appropriation becomes exhausted, the Antideficiency Act[14] may prevent the agency from making any further payments, but valid obligations will remain enforceable in the courts." GAO REDBOOK at 6-44 (3d ed. 2006), Add.25. Even though the lump sum appropriation account from which payment was anticipated becomes exhausted, a party to whom the United

---

[12]The precise language of the Court was:

> We see little functional difference between saying that amounts are "subject to the availability of appropriations" and saying that amounts are "available only as provided in appropriations laws," *and we conclude that the language of § 6906 limits the government's liability under PILT to the amount appropriated by Congress.*

*Greenlee County*, 487 F.3d at 878 (emphasis added).

[13]The view of this and other courts that pursuant to "subject to the availability of appropriations" language, the Secretary has but a single "obligation," *i.e.*, to make payments (to the extent that funds are available to do so), *see Greenlee County*, 487 F.3d at 878; *Arctic Slope*, 629 F.3d at 1304, is at odds with GAO's recognition that (1) there are multiple "obligations" to be fulfilled from one lump sum appropriation, GAO REDBOOK, ANNUAL UPDATE OF THE THIRD EDITION (Mar. 2014) at 2-11 to 2-12 (Add.30-31), and (2) an "obligation" is a definite commitment by the United States to pay money that creates a legal right in the intended recipient of that money to recovery in court for the failure of the government to effectuate such payment. *See* GAO, A GLOSSARY OF TERMS USED IN THE FEDERAL BUDGET PROCESS 70 (5th ed. 2005), Add.20.

[14]31 U.S.C. § 1341(a)(1)(A), (B), Add.18.

17

States has made a valid and binding obligation to make payment can successfully sue the government for any failure to do so. *See New York Airways, Inc. v. United States*, 369 F.2d 743, 748 (Ct. Cl. 1966) ("It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a government obligation created by statute"); *United States v. Langston*, 118 U.S. 389 (1886) (a statutory obligation to pay the Ambassador to Haiti $7,500 per year was not terminated by Congress' appropriating only $5,000; the Ambassador could sue for the $2,500 that the United States remained legally obligated to pay him).

Unsurprisingly, this rule applies with equal force to an obligation created by contract entered into by a government agency. *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892) (insufficient appropriations at the agency level "merely impose[ ] limitations upon the Government's own agents; it is a definite amount of money entrusted to them for distribution; but its insufficiency does not pay the Government's debts, *nor cancel its obligations*, nor defeat the rights of other parties") (emphasis added); *Wetsel-Oviatt Lumber Co., Inc. v. United States*, 38 Fed. Cl. 563, 571 (Fed. Cl. 1997) (same). The fact that the Antideficiency Act, which, among other things, attempts to preclude the government from entering into

18

any valid and binding obligation before Congress appropriates money to cover it, "applies only to government officials but does not affect any underlying legal obligation created by statute or contract" was also reiterated by the Supreme Court in *Ramah*.[15]

Thus, the question here is whether in FY 2006 and FY 2007 the United States made valid and binding obligations to pay Prairie County and Greenlee County the amounts determined by the formula set forth in § 6903 of the PILT Act.

The answer is "yes."

In *Greenlee County*, this Court had little problem recognizing that the PILT Act created a putative legal obligation on the part of the government toward an eligible county because the PILT Act "can *fairly be interpreted* as mandating compensation by the Federal Government for the damage sustained" and is "*reasonably amenable* to the reading that it mandates a right of recovery in damages." *Greenlee County*, 487 F.3d at 875 (Fed. Cir. 2007), quoting *White Mountain Apache Tribe*, 537 U.S. at 472-73 (emphases added and internal quotation marks omitted).

---

[15] 132 S. Ct. at 2185.

The *Greenlee* Court added that a "statute creating the right to compensation (or authorizing the government to contract) may restrict the government's liability or limit its contractual authority to the amount appropriated by Congress." *Greenlee County*, 487 F.3d at 878. The Court went on to opine that "subject to the availability of appropriations" language means that the government is not bound except to the extent that appropriations are available, *i.e.*, the government's *total* annual liability under PILT is limited to the *total* amount appropriated by Congress for that fiscal year. *Id.* at 879. However, that statement predated and is inconsistent with the Supreme Court's holding in *Ramah*.

Leading up to the Supreme Court's decision in *Ramah*, a divided panel of the 10th Circuit rejected that long-held position of this[16] and other circuits[17] that "[w]hen Congress says that 'the provision of funds [ ] is subject to the availability

_____

[16]*Arctic Slope*, 629 F.3d at 1304; *Greenlee County*, 487 F.3d at 878; *Oglala Sioux*, 194 F.3d at 1378; *Eastern Paralyzed Veterans*, 257 F.3d at 1362.

[17]*Cherokee Nation of Oklahoma v. Thompson*, 311 F.3d 1054, 1061 (10th Cir. 2002), *rev'd sub nom. Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005) and *mandate recalled, opinion vacated sub nom. Cherokee Nation of Oklahoma v. Leavitt*, 404 F.3d 1263 (10th Cir. 2005); *Shoshone-Bannock Tribes of Fort Hall Reservation v. Sec'y, Dep't of Health & Human Servs.*, 279 F.3d 660, 667 (9th Cir. 2002) ("The phrase 'subject to the availability of appropriations' has been construed by the Federal Circuit as 'clear and unambiguous,'[citing *Oglala Sioux*] and we do not disagree"); *Babbitt*, 87 F.3d at 1345.

20

of appropriations',[ ] it must mean that the government's *obligation* [ ] is limited

by the amount appropriated." *See Ramah Navajo Chapter v. Salazar*, 644 F.3d

1054, 1084 (10th Cir. 2011) (Hartz, J., dissenting) (emphasis in original).[18] As

noted, these cases had suggested that in such circumstances the government has but

one "obligation," *i.e.*, to make payments to all obligees to the extent that funds are

available to do so.

Because that view, as then most recently reiterated by this Circuit in *Arctic*

*Slope*, directly conflicted with the 10th Circuit's decision in *Ramah*, the Supreme

Court granted certiorari both in *Ramah* and in *Arctic Slope*.[19] Thereafter, in *Ramah*

it affirmed the decision of the 10th Circuit, 132 S. Ct. at 2195, and vacated this

Court's decision in *Arctic Slope*, 133 S. Ct. at 22.

---

[18]At the COFC, the government conceded that *Greenlee County* was decided
by the Federal Circuit on the same basis as was *Arctic Slope*, 629 F.3d 1296, *i.e.*,
that use of language such as "subject to the availability of appropriations" to
condition a government obligation to pay a plaintiff obviates any government
liability to the plaintiff once the appropriation has been exhausted. Def.'s Mot. to
Dismiss at 5-6, *Prairie County v. United States*, 113 Fed. Cl. 194 (Oct. 29, 2013),
Dct. 5.

[19]*Salazar v. Ramah Navajo Chapter*, *et al.*, 567 U.S. __, 132 S. Ct. 995
(Jan. 6, 2012); *Arctic Slope Native Assoc., Ltd. v. Sebelius*, __U.S. __, 29 f.3d Ct.
22 (June 25, 2012).

In *Ramah*, the Supreme Court noted that "subject to the availability" language is a "commonplace provision," 132 S. Ct. at 2188, used to condition the *creation* of a binding obligation of the United States to pay money to an intended recipient on Congress's appropriating sufficient funds to fulfill that obligation to that recipient. *Id.* at 2189-90. As it stated in *Cherokee Nation*, "[t]his kind of language normally makes clear that an agency and a contracting party can negotiate a contract prior to the beginning of a fiscal year but that the contract [*i.e.*, the obligation] will not become binding unless and until Congress appropriates funds for that year." *Cherokee Nation*, 543 U.S. at 643.[20]

---

[20]*Accord* Lloyd B. Miller, *A Most Unusual Alliance: Indian Tribes and Military Contractors Vindicate First Principles in the Ramah Litigation*, Fed. Law., October/November 2012, at 48, "subject to the availability of appropriations," is language that is commonly used "in government contracts and related authorizing statutes, and in 2005 the Supreme Court explained this clause 'makes clear' the contract 'will not become binding unless and until Congress appropriates funds for that year;'" 39 Comp. Gen. 340 (1959) which stated that:

> It has been held, in particular situations, that a conditional contract may be entered into prior to enactment by the congress of an appropriation therefor – that is a contract which specifically provides by its terms that the government's liability thereunder is contingent upon the future availability of appropriated moneys with which to make payment for the contract purposes. See 21 Comp. Gen. 864. Such a contract, of course, would become operative only if and when the appropriation subsequently is made.

In contrast, in *Greenlee County* this Court stated that "in some instances the statute creating the right to compensation (or authorizing the government to contract) may restrict the government's liability or limit its contractual authority to the amount appropriated by Congress," and found that the language "subject to the availability of appropriations" is commonly used to do so.

That view notwithstanding, in *Cherokee Nation* and *Ramah*, the Supreme Court left no doubt that using "subject to the availability of appropriations" language is not a means by which to restrict the government's maximum liability where many obligations are to be paid out of a single lump sum appropriation. Indeed, in *Ramah*, the Supreme Court indicated that if Congress wanted to limit the government's overall financial exposure it could not do so by making each individual payment obligation "subject to the availability of appropriations," and then providing an insufficient lump sum appropriation. The Supreme Court was nonetheless quick to note that "Congress is not short of options. For instance," to limit the government's overall program liability it could:

- amend the authorizing statute so as to remove the mandate compelling the agency to accept new entities into the program;

- give the agency the flexibility to pay less than the full amount of provided for in the statute; or

23

- elect to make line-item appropriations, allocating funds to cover each
  entity's payment on an entity by entity basis.

*Ramah*, 132 S. Ct. at 2195.

*Cherokee Nation* and *Ramah* stand for the proposition that, in the case of multi-year, annually funded programs that contain "subject to the availability of appropriations" language, whether a particular annual obligation to make a specified payment to a particular claimant becomes binding on the government is determined by examining:

1. whether a relevant appropriation was in existence before the annual obligation purportedly came into being,

2. whether the appropriation in question was a lump sum or a line item appropriation, and

3. whether at the outset, the relevant appropriation – lump sum or line item – was equal to or greater than the obligation of the United States to the claimant that has brought suit.

*Ramah,* 132 S. Ct. at 2184.

That a putative obligation of the United States is "subject to the availability of appropriations," even when coupled with language in the relevant appropriation that "not to exceed" a particular amount shall be for a particular object, does not

24

mean that the obligation is not still valid and binding, i.e. that the government's

overall duty to make such payments to all of the obligees ends, when funds in the

relevant appropriations account become exhausted. *See Cherokee Nation*,

543 U.S. at 642, and *Ramah*, 132 S. Ct. at 2184.

This position is also reflected in the GAO REDBOOK,[21] Add.24. Prior to the

Supreme Court's decision in *Ramah*, the Redbook stated "The courts have agreed

that the 'subject to the availability of appropriations' language conditions the Act's

entitlement, so that the *reimbursement amounts intended by the Act must be*

*reduced* where Congress has clearly appropriated insufficient funds to meet them

in full." GAO REDBOOK at 6-55 to 6-56 (3d ed. 2006) (emphasis added), Add.27-

28. After *Ramah*, GAO revised this portion of its Redbook to read that:

> The Supreme Court determined that the "subject to the availability of
> appropriations" language conditions the Act's entitlement, but that

---

[21]As this and other courts have stated on numerous occasions, the opinions of the [Government Accountability] Office ("GAO"), as expressed in *Principles of Federal Appropriations Law* ("GAO REDBOOK"), and in the opinions of the Comptroller General, both of whose opinions, while not binding, are "expert opinion[s], which we should prudently consider." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984); *see also Lincoln v. Vigil*, 508 U.S. 182, 192, 113 S. Ct. 2024, 124 L.Ed.2d 101 (1993) (relying on GAO REDBOOK at 6-159 (rev. 3d. ed. at 6-18; Add.24)); *Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*, 269 F.3d 1112, 1116 (D.C. Cir. 2001); *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1084 (Fed. Cir. 2003), *aff'd and remanded sub nom. Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005).

condition is fulfilled when Congress appropriates "sufficient legally unrestricted" funds to meet its Indian Self-Determination and Education Assistance Act obligations "even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts."[22]

GAO REDBOOK, ANNUAL UPDATE OF THE THIRD EDITION (Mar. 2014) at 2-11 to 2-12 (emphasis in original),[23] Add.30-31.

Given the understandable importance that the Supreme Court has attached to giving similar appropriations language a uniform meaning, *Cherokee Nation*, 543 U.S. at 644, there is no basis in the wake of *Ramah* not to do so here, at least in the absence of a showing by the government that Congress had a contrary intent.

For FY 2006, the tentative obligation of the United States to Prairie County that was conditioned on the availability of an appropriation proved to be only $128,846. Consequently, upon the appropriation of $236 million by Congress for

---

[22]The Supreme Court referenced *Ferris*, 27 Ct. Cl. at 546 ("A contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects"); *see also Cherokee Nation*, 543 U.S. at 637-38; *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 552, n.9 (1980).

[23]The GAO's recognition that there are multiple "obligations" to be fulfilled from the lump sum appropriation is in sharp contrast to this and the court's position, *see, e.g., Arctic Slope*, 629 F.3d at 1304, that the Secretary has but a single "obligation" to make payments (to the extent that funds are available to do so). However, GAO's position is entirely consistent with its definition of an "obligation" as a commitment that is enforceable by the obligee. *See supra* n.13.

purposes of PILT, the condition was fulfilled and the government's legal obligation to "make a payment" to Prairie County for FY 2006 in the amount of $128,846 (the amount provided in the statute) became valid and binding. The same is true in FY 2007 when the amount appropriated by Congress (again $236 million) was enacted and the amount of the tentative obligation to Prairie County was only $133,140.[24]

As has been stated both by GAO and the courts, where, as here, a binding obligation comes into being, but the lump-sum appropriation account from which payment was intended later proves to be insufficient, the exhaustion of money in that account may preclude the accounting officers of the government from making further payments, but it does not change the fact that the obligation remains fully enforceable in court. GAO REDBOOK at 6-44 (3d ed. 2006), Add.25. More specifically, if a lump-sum appropriation from which payment is to be made subsequently proves insufficient, that fact does not defeat a valid government obligation – whether the obligation was created by a contract to pay for excavation on the Delaware River, *Ferris*, 27 Ct. Cl. at 546; by a statute to provide a subsidy

---

[24]The same is also true with respect to Greenlee County regarding which the tentative obligations were $398,996 for FY 2006 and $582,314.15 for FY 2007 in comparison to appropriations of $236 million for each fiscal year.

to helicopter mail carriers, *New York Airways*, 369 F.2d at 748; or by statute to

bring the total payment by the United States to Prairie County up to a level

intended to cover **the cost of providing services related to** federal lands located

within its borders.  *See Prairie County*, 113 Fed. Cl. 194, 197 (Oct. 29, 2013),

*citing Lawrence County*, 469 U.S. at 258.  Simply put, a *valid* obligation of the

United States to pay a sum of money to another, like a valid obligation of an

individual to do so, is not extinguished simply because the account from which

payment is to be made becomes exhausted.

    **C.**     **Contrary To The Finding Of The COFC, The  Supreme Court's Holding In *Cherokee Nation* And *Ramah* As To The Import Of "Subject To The Availability Of Appropriations" Language Is Not Somehow Trumped By The Holding Of This Court In *Greenlee County***

        **1.**     **The View Of The Supreme Court As To The Import Of "Subject To The Availability Of Appropriations" Language Is A Reiteration Of Its Holding In *Leiter* And Is Binding**

In *Cherokee Nation* and in *Ramah*, the Supreme Court held that "subject to

the availability of appropriations" language means only that a binding government

obligation does not come into existence unless and until Congress appropriates

funds to cover it.  *Cherokee Nation*, 543 U.S. at 643.  *See Ramah*, 132 S. Ct. at

2189.  That is not only consistent with the teachings of GAO but also consistent

with an earlier Supreme Court holding on the import of such language with regard

to other putative multi-year obligations.  In *Leiter*, 271 U.S. 204, the Court held

that a multi-year lease on which payments to the lessor were "subject to an

appropriation by Congress" was binding on the government only for one fiscal

year because at the time the leases were entered "there were no appropriations

available for the payment of the rent after the first fiscal year during the term of

each lease."  *Id.* at 205; B-239435 (inclusion by statute of "subject to the

availability of appropriations" language in 35 year leases indicates that the

Congress did not intend to authorize the Secretary to obligate the United States to

future payments under the agreements prior to the enactment of an annual

appropriation to pay for them).  *See also* GAO REDBOOK at 6-52 (3d ed. 2006),

Add.26 ("since at the time [the leases] were made there was no appropriation

available for payment of rent after the first fiscal year, it is clear that in so far as

their terms extended beyond that year they were in violation of the express

provisions of the [Antideficiency Act]").

Lower courts are bound to follow the Supreme Court's decisions until they

are withdrawn or modified.  *Am. Tradition P'ship, Inc. v. Bullock*, 132 S. Ct. 1307

(2012).  Indeed, "[w]hen [the Supreme Court] applies a rule of federal law to the

parties before it, that rule is the controlling interpretation of federal law and must

be given full retroactive effect in all cases still open on direct review and as to all

29

events, regardless of whether such events predate or postdate our announcement of the rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993).

Under the circumstances, the import of "subject to the availability of appropriations" language as found by the Supreme Court in *Leiter* and reiterated in *Cherokee Nation* and *Ramah* is binding.

> **2.**    **Other Binding Precedent Of This Court Provides That There Is No Distinction In The Legal Import Of "Subject To The Availability Of Appropriations" Language Based On Whether The Relevant Underlying Obligation Was Created By An Agency Through Contract Or By Congress' Creating A Statutory Benefits Program Or Other Duty To Pay Money**

Cases such as *Eastern Paralyzed Veterans*, *Langston*, *New York Airways* and *Wetsel-Oviatt* demonstrate that the rules of appropriation law apply equally to legal obligations of the government whether created by statute or by contract. The COFC rejected that view. Believing that *Ramah* applies only to obligations created by contract, it concluded that *Ramah* had no application in the instant situation and did not impact this Court's decision in *Greenlee County*.

Those conclusions were erroneous.

In *Eastern Paralyzed Veterans*, the Federal Circuit held that the rules which apply to government obligations that are "subject to the availability of appropriations" and created pursuant to a statutory benefit program are exactly the

30

same as the rules that apply to similarly conditioned obligations that are created by

contract. *Eastern Paralyzed Veterans*, 257 F.3d at 1363.

*Eastern Paralyzed Veterans* involved the Veterans' Health Care Eligibility

Reform Act of 1996[25] ("the VHC Act"), under which the Department of Veterans

Affairs was to provide hospital and medical care to veterans.

As the Federal Circuit noted,

> The [VHC] Act requires the Department to "maintain[ ] its capacity to
> provide for the specialized treatment and rehabilitative needs of
> disabled veterans (including veterans with spinal cord dysfunction,
> blindness, amputations, and mental illness) within distinct programs
> or facilities of the Department that are dedicated to the specialized
> needs of those veterans in a manner that (A) affords those veterans
> reasonable access to care and services for those specialized needs, and
> (B) ensures that overall capacity of the Department to provide such
> services is not reduced below the capacity of the Department,
> nationwide, to provide those services, as of [the date of enactment]."
> 38 U.S.C. § 1706(b)(1).

*Eastern Paralyzed Veterans*, 257 F.3d at 1355.  As such, it is indisputable that the

VHC Act involved a statutorily-created benefit program.

What is also indisputable is that, in the VHC Act, Congress provided that the

creation of any government obligation pursuant to the statute be conditioned on the

existence of an appropriation from Congress:

---

[25]Pub. L. No. 104-262, § 104, codified at 38 U.S.C. § 1704 *et seq.*

> (a) (1) The Secretary *(subject to paragraph (4))* shall furnish hospital care and medical services, and may furnish nursing home care, which the Secretary determines to be needed . . .
>
> (4) The requirement . . . that the Secretary furnish hospital care and medical services . . . shall be effective in any fiscal year *only to the extent and in the amount provided in advance in appropriations Acts for such purposes.*"[26]

38 U.S.C. § 1710.

This Court found that the quoted language, just as the language at issue in *Oglala Sioux* did, "indicate[s] congressional intent to make [veterans' medical care] **subject to the availability of appropriations**." *Eastern Paralyzed Veterans*, 257 F.3d at 1363, *citing Oglala Sioux*, 194 F.3d at 1378 (emphasis added).

---

[26]This language is also the functional equivalent of "subject to the availability of appropriations." *See Cherokee Nation*, 543 U.S. at 643. Such language is included in statutes like PILT that authorize annual payments so as to avoid the creation of obligations for which the government's liability would be ongoing. *See, e.g., Seatrain Lines, Inc. v. United States*, 99 Ct. Cl. 272 (1943), the Court of Claims even found the government liable for breach of contract damages where Congress, in an appropriation act, expressly denied a department funds to pay for services rendered to the government under a valid contract. *Id.* at 316. Conversely, based on the inclusion of subject to the availability of appropriations-type language in the PILT Act, if at the outset of any fiscal year, Congress chose not to appropriate any money for the program, the condition on which the government's duty to make payments to PILT recipients was based would not have been met and, as a result, the government would not be required to make any PILT payments in that fiscal year.

32

The plaintiff in *Eastern Paralyzed Veterans* argued that "because veterans are enrolled for a year, the Department must continue to furnish them medical services for that period, even though during that period the Department runs out of funds to do so." *Eastern Paralyzed Veterans*, 257 F.3d at 1362.

In its ruling on the extent, if any, of the government's obligation to provide the services seemingly mandated by the VHC Act, this Court made no distinction in the rules governing the import of "subject to the availability of appropriations" language between an obligation created by a statutory benefits program and an obligation created by contract. Instead, this Court held that both the "language and reasoning used in [*Oglala Sioux*, where this Circuit stated that "the ability of Interior to bind the Government ***contractually*** was expressly conditioned on the availability of appropriations"] ***are equally applicable to the present case*** . . ." (emphasis added). That the "subject to the availability of appropriations" obligation in *Eastern Paralyzed Veterans* was created pursuant to a benefits program was in no way determinative of what liability could attach to the government.

The statement in *Greenlee County* (*citing Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1355 (Fed. Cir. 2005)) that "subject to the availability of appropriations" language has a different import with respect to an obligation

created as part of a benefits program than it does with respect to an obligations created by contract, not only was dismissed by the Supreme Court in *Cherokee Nation*, 543 U.S. at 632, but is in direct conflict with *Eastern Paralyzed Veterans*.

As the earlier precedent, *Eastern Paralyzed Veterans*, not *Greenlee County* (or *Star-Glo*), is controlling. Under that precedent, the import of subject to the availability language is the same irrespective of whether the obligation which it conditions was the product of a contract, a statutory benefits program, or some other statutory program.

The Federal Circuit has stated, "This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc*. Where there is direct conflict, ***the precedential decision is the first***." *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) (citations omitted, emphasis added). *Accord Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1320-21 (Fed. Cir. 2012), *cert. granted*, No. 12-1163, 2013 WL 1217353 (U.S. Oct. 1, 2013), *citing Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed. Cir. 1989); *Entergy Nuclear Fitzpatrick, LLC v. United States*, 101 Fed. Cl. 464, 472-73 (2011) (finding that because two Federal Circuit cases were contradictory, the court "must find" that the earlier case is the controlling precedent of the Federal Circuit). Consequently, this Court is

34

bound by *Eastern Paralyzed Veterans* and the holding in that case that the rules relating to obligations that are subject to the availability of appropriations and were created by statutory benefits programs are exactly the same as those relating to similar obligations created by contract.

Under this court's holding in *Eastern Paralyzed Veterans* and the Supreme Court's decision in *Ramah* that "subject to the availability of appropriations" language relates to whether an appropriation was in existence at the time the obligation was putatively created, not to the extent of the obligation, applies equally to obligations created as part of a putative benefits program and those that are created by contract.

*Ramah* is not, therefore, "inapposite." The COFC's conclusion to the contrary was erroneous.

### 3. In Any Event, Any Notion That "Subject To The Availability Of Appropriations" Language Has A Different Import With Regard To Obligations Created In A Statutory Benefits Program Is Not Well Founded

In *Greenlee County*, this Court stated that "PILT . . . involves a benefit program not a contract, and that 'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated." *Id.* at 879, *citing Star-Glo*, 414 F.3d at 1355.

35

First, this conclusion is at odds with the statements of GAO which indicate that, without more, valid obligations of the United States are binding and enforceable in court whether they are contained in entitlement programs or in contracts. "Authorization for *entitlements* constitute a binding obligation on the part of the Federal Government, and eligible recipients have legal recourse if the obligation is not fulfilled." GAO, A GLOSSARY OF TERMS USED IN THE FEDERAL BUDGET PROCESS 57 (3d ed. 1981), Add.20. Additional recognition of the fact that there is no difference in appropriation law with respect to statutorily-created obligations and those created by contract can be seen in the brief of the government in *Oglala Sioux* where it argued that "Oglala has no statutory or contractual right to additional funding . . . because *under the ISDA* the requirement to fund such costs is subject to the availability of appropriations." *Oglala Sioux*, 194 F.3d at 1377 (emphasis added).[27]

Second, PILT is not a "benefit" program – any more than the programs in *New York Airways* (statutory subsidy for the cost of carrying mail) or *New York Cent. R.R. Co. v. United States*, 65 Ct. Cl. 115, 125 (1928) (statutory entitlement to fair and reasonable compensation for providing railway mail service) were

---

[27]*See also supra* n.15 and n.20 and accompanying text.

36

"benefits" programs. As the COFC itself recognized, in *Lawrence County*,

469 U.S. at 258, the Supreme Court found that Congress had enacted PILT "to

compensate local governments . . . *for the cost of providing services related to*

[federal lands located in their jurisdictions]." *Prairie County*, 113 Fed. Cl. at 197

(emphasis added),[28] Add.2. *See also* Proceedings and Debates of the 110th

Congress, First Session, 153 Cong. Rec. S3986-04 (Mar. 28, 2007) (Statement of

Sen. Wyden) (PILT is not a welfare program and PILT payments are not

handouts).

The PILT Act did not create a "benefits" program. Rather, it simply

provided that the revenue-sharing payments to which the government had already

agreed to provide local governments in lieu of taxes would be supplemented, but

only if and as needed, so that the total annual amount that an eligible county

received from the federal government would not greatly fluctuate. After the

enactment of PILT, in years when revenue-sharing amounts were high, an eligible

---

[28]Appellants acknowledge, as they must, that a "trial judge, believing that [a prior circuit court decision] contravene[s] a Supreme Court precedent . . . may do no more than criticize those opinions, urging en banc review." *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005); *Prairie County*, 113 Fed. Cl. at 201. Since no panel can overturn the holding of another, Appellants also recognize that undoing the wrongful view of PILT expressed in *Greenlee County*, while not required here, is the function of the Court sitting *en banc*.

county would receive little or no PILT funds, whereas more PILT funds would be paid in years where revenue-sharing amounts were low.

Lastly, although in *Greenlee County* the Federal Circuit cited *Star-Glo* for the proposition that "'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated," 414 F.3d at 1355, that is an overstatement of the holding in *Star-Glo*. The *Star-Glo* court held only that where the government is seeking to limit its statutory rather than contractual liability, "there is greater room *to rely on other indicia of Congressional intent, such as legislative history, to ascertain the congressional purpose*." 414 F.3d at 1355 (emphasis added).[29] As the Supreme Court made clear in *Ramah*, such indicia must be something other than the size of the overall appropriation made by Congress from which the particular program was funded.

Moreover, it bears noting that the above statement in *Star-Glo* was made in the context of a program designed merely to compensate citrus farmers for losses they had suffered owing to the State of Florida's destruction of their grapefruit

---

[29]It need be noted that the decision in *Star-Glo* turned solely on the fact that the statutory payment there in issue applied only to acres actually planted, not to unplanted acres as Appellants claimed, 414 F.3d at 1356-58, and *not* on the exhaustion of funds in the relevant appropriation account. Indeed, as the Court admitted "we do not reach the exhaustion issue." *Id.* at 1350. As such, the statement in *Star-Glo* was merely dicta.

trees – *i.e.*, a program in which predictability of payment certainly was not critical. In stark contrast, the principal purpose for enacting PILT was to provide a predictable level of revenue to counties containing federal land, *i.e.*, to insure against shortfalls in the revenue-sharing programs by which the federal government provides eligible counties with the bulk of its payments in lieu of taxes to support the continuation of local services on federal lands. *See supra* n.2 and accompanying text

> **D.** **Because *Greenlee County* Is Not A Controlling Precedent And The Court Is Bound By *Ramah* And *Eastern Paralyzed Veterans*, Issue Preclusion Does Not Apply To Appellant Greenlee County's Claim In This Action**

The COFC recognized that the issue preclusion doctrine "is subject to exceptions when the circumstances dictate," *citing Bingaman v. Dep't of the Treasury*, 127 F.3d 1431, 1437 (Fed. Cir.1997). *Prairie County*, 113 Fed. Cl. at 203, Add.9. However, it held that the exception did not apply here vis-à-vis Appellant Greenlee County's claim because *Ramah* (and *Cherokee Nation*) did not work a change in the applicable law. Specifically, the Court stated that "that there has been no change to the precedential force of *Greenlee County*, and accordingly this exception does not apply." *Id*.

As demonstrated above, the COFC's continuing reliance on *Greenlee County* (*citing Star-Glo*, 414 F.3d at 1355) was misplaced. First, subsequent to *Greenlee County*, the Supreme Court made it abundantly clear that "subject to the availability of appropriations" language did not mean that the government's obligation to make payments ended when the funds in the relevant lump-sum appropriation account were exhausted. There is no question that the legal import of "subject to the availability of appropriations" language on putative obligations of the United States is now governed by *Ramah*, and that *Ramah* did thus affect a change in the law that is relevant here. Under *Ramah*, the mere inclusion in the PILT Act of language effectively making the government's payment obligation subject to the availability of appropriation is no longer an absolute bar to a plaintiff's recovering the full amount provided for in the statute, so long as the sum appropriated by Congress was sufficient to satisfy that plaintiff's claim. *Greenlee County* would have been decided differently had it followed *Ramah*.

Second, as in the earlier precedent, *Eastern Paralyzed Veterans*, not *Greenlee County* or *Star Glo*, is controlling. Because *Eastern Paralyzed Veterans* holds that the rules relating to obligations that are subject to the availability of appropriations and were created by statutory benefits programs are exactly the

40

same as the rules regarding similar obligations created by contract, and *Ramah* is not "inapposite" as the COFC concluded.  Add.7.

Consequently, this is a case in which exceptional circumstances exist, s*ee Bingaman*, and Greenlee County's claim in this action is not precluded.

**CONCLUSION**

In *Ramah* and *Cherokee Nation*, the Supreme Court reiterated its holding in *Leiter* as to the import of "subject to the availability of appropriations" language, *i.e.*, that all that "subject to the availability of appropriation" language does – particularly in the context of a putative multi-year obligation that is annually funded – is "make[ ]clear" that the legal obligation of the United States to make an annual payment "will not become binding unless and until Congress appropriates funds for that year."  *Cherokee Nation*, 543 U.S. at 643 (other citations omitted); *see Ramah*, 132 S. Ct. at 2189.  These holdings are binding on this Court.

Once Congress appropriates funds for the year, as it did here for the FY 2006 and FY 2007 with regard to PILT, the United States' obligation to Prairie County and its payment obligation to Greenlee County, in both years, became valid and binding.  As with *any* binding obligation of the United States, while the subsequent exhaustion of funds in the a lump sum appropriation account from which the payment was intended to be made prevents the accounting officers of the

41

government from making further payments, the obligation remains fully enforceable in court by the obligee.  This is true whether the obligation arose by contract, through a statutory benefit program or otherwise.  Simply put, the United States cannot just walk away from a valid and binding obligation.

Accordingly, this Court should reverse the COFC's granting of the government's motion to dismiss this case and the dismissal of the Counties' motion for class certification and remand the matter to the COFC for further proceedings consistent with the Court's holdings.

Respectfully submitted,

s/*Alan I. Saltman*
Alan I. Saltman
SMITH, CURRIE & HANCOCK LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C.  20036
(202) 452-2140
(202) 775-8217 – fax
email: AISaltman@smithcurrie.com

Counsel for Plaintiffs-Appellants

OF COUNSEL:

Charles W. Surasky
Sᴍɪᴛʜ, Cᴜʀʀɪᴇ & Hᴀɴᴄᴏᴄᴋ LLP
245 Peachtree Center Avenue, N.E.
Suite 2700, Marquis One Tower
Atlanta, GA  30303-1227
(404) 582-8022
(404) 688-0671 – fax
email: CWSurasky@smithcurrie.com

Evangelin Lee Nichols
Sᴍɪᴛʜ, Cᴜʀʀɪᴇ & Hᴀɴᴄᴏᴄᴋ LLP
1025 Connecticut Avenue, N.W.
Suite 600
Washington, D.C.  20036
(202) 452-2140
(202) 775-8217 – fax
email: ELNichols@smithcurrie.com

Dated:  June 20, 2014

CASE PARTICIPANTS ONLY Document: 57 Page: 57 Filed: 06/20/2014

# ADDENDUM

# In the United States Court of Federal Claims

No. 12-645C
(Filed: October 29, 2013)

```
*************************************
PRAIRIE COUNTY, MONTANA and      *
GREENLEE COUNTY, ARIZONA,        *
                                 *
              Plaintiffs,        *
                                 *
v.                               *
                                 *
THE UNITED STATES,               *
                                 *
              Defendant.         *
*************************************
```

Payment in Lieu of Taxes Act, 31
U.S.C. §§ 6901-6907; Accrual
Suspension; Contract Programs
Versus Benefits Programs; RCFC
12(b)(6)

Alan I. Saltman, Washington, DC, for plaintiffs.

Sharon A. Snyder, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge.

Plaintiffs Prairie County, Montana and Greenlee County, Arizona seek to recover monies that they claim are due to them under the Payment in Lieu of Taxes Act ("PILT"), 31 U.S.C. §§ 6901-6907 (2000). Greenlee County previously was unsuccessful in seeking payments under the statute before the United States Court of Federal Claims ("Court of Federal Claims") and the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). Defendant moves to dismiss this action based on the earlier decision of the Federal Circuit. In this action, plaintiffs argue that a recent United States Supreme Court ("Supreme Court") decision changed the law such that the previous decision of the Federal Circuit no longer remains controlling precedent. Because the court rejects plaintiffs' argument, defendant's motion is granted, and accordingly plaintiffs' complaint is dismissed.

## I. BACKGROUND

### A. The Payment in Lieu of Taxes Act

In 1964, Congress established the Public Land Law Review Commission ("commission") to "conduct a comprehensive review of the policies applicable to the use, management, and disposition of the Federal lands." S. Rep. No. 94-1262, at 5 (1976). The commission returned its report four years later, recommending that the federal government no longer continue the "historic policy of disposal" of public lands but should instead keep federal ownership of the

lands then held.  Id. at 6 (citing Public Land Law Review Commission, One Third of the Nation's Land:  A Report to the President and the Congress by the Public Land Law Review Commission (1970) 1).  The commission also suggested that, if its recommendation of maintaining the lands owned by the federal government was followed, then it was "the obligation of the United States to make certain that the burden of that policy is spread among all the people of the United States and is not borne only by those states and governments in whose area the lands are located."  Id.

Agreeing with this recommendation, Congress enacted the PILT in 1976 "to compensate local governments for the loss of tax revenues resulting from the tax-immune status of federal lands located in their jurisdictions, and for the cost of providing services related to those lands."  Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1, 469 U.S. 256, 258 (1985).  The Supreme Court explained that the PILT was intended to address a deficiency in the way that public lands were provided with governmental services:

> Where these lands consisted of wilderness or park areas, they attracted thousands of visitors each year.  State governments might benefit from this federally inspired tourism through the collection of income or sales taxes, but these revenues would not accrue to local governments, who were often restricted to raising revenue from property taxes.  Yet it was the local governments that bore the brunt of the expenses associated with federal lands, such as law enforcement, road maintenance, and the provision of public health services.

Id. at 262-63 (citing S. Rep. No. 94-1262 at 8-9).

Pursuant to the PILT, the United States Department of the Interior ("Interior" or "agency") "shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located as set forth in this chapter."  31 U.S.C. §6902(a)(1).  A "unit of general local government" includes counties and other municipalities that the Secretary of the Interior "determines to be the principal provider or providors of governmental services within the state[.]"  Id. § 6901(2)(A).  "Entitlement land" includes land owned by the United States in the National Park System and the National Forest System.  Id. § 6901(1).

To determine the amount of a payment directed by § 6902(a)(1), the agency computes payment amounts for each unit of general local government under two alternative formulas set forth in the PILT, and then distributes the higher of the two amounts calculated.  Id. § 6903(b)(1).  The agency receives funding to make the payments directed by § 6902(a)(1) through congressional appropriations.  During all times relevant to this litigation, the PILT provided:  "Necessary amounts may be appropriated to the Secretary of the Interior to carry out this chapter.  Amounts are available only as provided in appropriation laws." [1]  Id. § 6906.  In

---

[1]  In 2008 and 2012, the PILT's funding provision was amended to read:

For each of the fiscal years 2008 through 2013 –

2006 and 2007, Congress appropriated less than the amount necessary to pay the full authorized payment amounts to every qualified unit of general local government. Consistent with the regulations, Interior proportionally reduced the authorized payment amounts to conform to the amount of funds actually appropriated.

## B. Plaintiffs' Allegations

Plaintiffs are political subdivisions of their respective states that qualify as units of general local government as defined by the PILT and in which entitlement land is located. Prairie County alleges that it was entitled to receive a payment of $261,987 for fiscal years 2006 and 2007 under the PILT formulas, but that it only received a $173,061 payment, a difference of $81,500. Greenlee County alleges that it was entitled to receive a payment of $981,310 under the PILT formulas for fiscal years 2006 and 2007, but that it only received a $645,927 payment, a difference of $335,383. Plaintiffs allege, in Count II of their complaint, that they remain entitled to the difference between what was due to them pursuant to the statutory formulas and the amount actually paid. Plaintiffs also seek, in Count I of the complaint, to certify a class of similarly situated units of general local governments that, like the two named plaintiffs, allegedly did not receive all of the monies that were due to them under the PILT.

## C. Procedural Background

Plaintiffs filed their complaint on September 27, 2012. Defendant subsequently moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").

In its motion, defendant relies primarily on the decision in Greenlee County v. United States, 487 F.3d 871 (Fed. Cir. 2007), in which the Federal Circuit rejected Greenlee County's prior suit for the recovery of the PILT shortfalls. Defendant argues that Greenlee County and the principle of issue preclusion prevent plaintiffs in this action from stating a cause of action that would allow the court to rule in plaintiffs' favor. Oral argument is unnecessary.

## II. DISCUSSION

## A. RCFC 12(b)(6) Motion to Dismiss

"A complaint must be dismissed under Rule 12(b)(6) when the facts asserted do not give rise to a legal remedy." Indian Harbor Ins. Co. v. United States, 704 F.3d 949, 954 (Fed. Cir.

> (1) each county or other eligible unit of local government shall be entitled to payment under this chapter; and
>
> (2) sums shall be made available to the Secretary of the Interior for obligation or expenditure in accordance with this chapter.

31 U.S.C. § 6906 (2006), amended by Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 100111, 126 Stat. 405, 906 (2012); Emergency Economic Stabilization Act of 2008, Pub. L. 110-343, § 601(c)(1), 122 Stat. 3765, 3911 (2008).

2013) (citing Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). "When considering an RCFC 12(b)(6) motion, the court "must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v Fitzgerald, 457 U.S. 800, 814-19 (1982)). "[T]he consequence of a ruling by the court . . . that plaintiff's case does not fit within the scope of the [money-mandating] source . . . is simply this: plaintiff loses on the merits for failing to state a claim on which relief can be granted." Jan's Helicopter Serv. v. United States, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (alteration in original); see also RhinoCorps Co. v. United States, 87 Fed. Cl. 481, 492 (2009) ("A motion made under Rule 12(b)(6) challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2006)). "Deciding whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556). Neither allegations "that are 'merely consistent with' a defendants liability," nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are sufficient. Id.

"The court assumes all well-pled factual allegations are true and indulges in all reasonable inferences in favor of the nonmovant." Terry v. United States, 103 Fed. Cl. 645, 652 (2012) (citing United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006)). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

## B. Greenlee County Remains Controlling Precedent

Defendant relies upon Greenlee County to argue that plaintiff cannot state a claim upon which relief can be granted. Because the court agrees that Greenlee County is controlling, a fuller discussion of the Federal Circuit's decision is warranted.

In 2004, Greenlee County filed suit alleging that it did not receive the full amount of the PILT monies to which the statutory formulas entitled it because Congress had not appropriated enough money to fully fund the program. Greenlee County, 487 F.3d at 874-75. The Court of Federal Claims granted the government's motion to dismiss, and Greenlee County appealed. Id.

The Federal Circuit affirmed. It first noted that a line of cases going back as far as 1886 established that Congress's failure to appropriate funds did not defeat a suit to enforce an obligation set by statute. Id. at 877. The Federal Circuit explained that this proposition had been expressed at least as early as 1886, when the Supreme Court held that the United States Ambassador to Haiti could sue the government to recover his full $7,500 annual salary set by

statute despite the fact that Congress had only appropriated $5,000 that year.  Id. (citing United States v. Langston, 118 U.S. 389, 390 (1886)).  In its Greenlee County decision, the Federal Circuit also found  persuasive the reasoning expressed in a United States Court of Claims' decision:  "'It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute.'"  Id. (quoting N.Y. Airways, Inc. v. United States, 369 F.2d 743, 748 (Ct. Cl. 1966)).  According to the Federal Circuit, in some instances a "failure [of Congress] to appropriate funds to meet statutory obligations prevents the account officers of the Government from making disbursements, but such rights [remain] enforceable in the Court of Claims."  Id. (quoting N.Y. Airways, 369 F.2d at 748) (alterations in original).

The Federal Circuit then turned its inquiry to whether the PILT fit into this template because "in some instances, the statute creating the right to compensation (or authorizing the government to contract) may restrict the government's liability or limit its contractual authority to the amount appropriated by Congress."  Id. at 878.  It concluded that the PILT was so limited, focusing on the language of § 6906 that "[a]mounts are available only as provided in appropriation laws."  Id.  The court first noted that "the language 'subject to the availability of appropriations' is commonly used to restrict the government's liability to the amounts appropriated by Congress for the purpose."  Id.  It continued:

> [W]e have stated that "[a]lthough [a plaintiff] may have expected to receive full funding . . . based on past experiences, the subject-to-availability-of-appropriations language . . . prevents [the plaintiff] from asserting that it was entitled to full funding as a matter of right."  Thus it is undisputed that if PILT used the phrase "subject to the availability of appropriations," Greenlee County's right to recover would be limited to the amount appropriated.

Id. (citation omitted).  The court concluded:  "We see little functional difference between saying that amounts are 'subject to the availability of appropriations' and saying that amounts are 'available only as provided in appropriations laws,' and we conclude that the language of § 6906 limits the government's liability under PILT to the amount appropriated by Congress."  Id.

Importantly, the Federal Circuit's decision in Greenlee County also characterized the program authorized by the PILT as a benefits program and not as establishing a contract between units of general local government and the United States.  "PILT . . . involves a benefit program not a contract, and 'there is great room' in benefits programs to find the government's liability limited to the amount appropriated."  Id. at 879 (citing Star-Glo Assocs., LP v. United States, 414 F.3d 1349, 1355 (Fed. Cir. 2005)). Therefore, the court concluded "that the government's liability for PILT payments was limited to the amounts appropriated by Congress."  Id. at 880.

Plaintiffs recognize this precedent.  Nonetheless, they argue that the Supreme Court's decision in Salazar v. Ramah Navajo Chapter, 132 S. Ct. 2181 (2012), changed the law

sufficiently such that the Federal Circuit's prior <u>Greenlee County</u> decision is no longer controlling.[2]  Plaintiffs contend:

> <u>Ramah</u> holds that once Congress has appropriated sufficient legally unrestricted funds to pay an obligation to the plaintiff out of an appropriation account from which others are to be paid, the government cannot back out of its promise to pay the plaintiff upon the exhaustion of funds in that account.  This is true even if the government's obligation to pay is subject to the availability of appropriations.

Pls.' Resp. 5 (footnotes and citations omitted).  Under <u>Ramah</u>, plaintiffs argue, the PILT must be read as an obligation to pay the full amount set by the statutory formulas, even if the amount appropriated has been exhausted.

Plaintiffs misread <u>Ramah</u>, a decision which involved breach of contract, not a benefits program.  The decision in <u>Ramah</u>, concerned a suit by Indian tribes arising under the Indian Self-Determination Act ("ISDA"), 25 U.S.C. §§ 450f-450n (1988 & Supp. II). 132 S. Ct. at 2186.  Specifically, the issue before the Supreme Court in <u>Ramah</u> was whether the ISDA requires the Secretary of the Interior to contract to pay the "contract support costs" related to each self-determination contract.  <u>Id.</u>  The ISDA "directs the Secretary of the Interior, 'upon the request of any Indian tribe . . . to enter into a self-determination <u>contract</u> . . . to plan, conduct, and administer' health, education, economic, and social programs that the Secretary otherwise would had administered."  <u>Id.</u> (quoting 25 U.S.C. § 450f(a)(1)) (emphasis added).  "Congress included a model <u>contract</u> in ISDA and directed that each tribal self-determination contract 'shall . . . contain or incorporate it by reference.'"  <u>Id.</u> at 2187 (quoting 25 U.S.C. § 450*l*) (emphasis added).  The model contract provided for by the ISDA specifies that "'[s]ubject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement' between the Secretary and the tribe."  <u>Id.</u> (quoting 25 U.S.C. § 450*l*(c)) (emphasis added).

In <u>Ramah</u>, the Supreme Court explained that between fiscal years 1994 and 2001, "appropriations covered only between 77% and 92% of tribes' aggregate contract support costs. . . . Lacking funds to pay each contractor in full, the Secretary paid tribes' contract support costs on a uniform, pro rata basis."  <u>Id.</u>  Several Indian tribes sued for breach of contract for the unpaid sums.  <u>Id.</u> at 2188.  Relying on its earlier decision in <u>Cherokee Nation of Oklahoma v. Leavitt</u>, 543 U.S. 631 (2005), the Supreme Court held that the tribes could recover despite the language in the contract making payment "[s]ubject to the availability of appropriations" because the "Government cannot back out of its contractual promise to pay each Tribe's full contract support

---

[2]  Plaintiffs also rely on the Supreme Court's decision in <u>Arctic Slope Native Ass'n v. Sebelius</u>, 133 S. Ct. 22 (2012), for the same proposition.  The Supreme Court's decision in <u>Arctic Slope</u> was a memorandum opinion that vacated the judgment of the Federal Circuit dismissing an Indian tribe's suit for contract support costs under the ISDA in light of <u>Ramah</u>, and remanded for further proceedings.  <u>Id.</u>  <u>Arctic Slope</u> provides no independent change in the law.

costs." <u>Ramah</u>, 132 S. Ct. at 2191. The Supreme Court's decision in <u>Ramah</u> turned on the contractual relationship between the parties:

> Our conclusion in <u>Cherokee Nation</u> followed directly from well-established principles of Government contracting law. When a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, it has long been the rule that the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends. That is so "even if an agency's total lump-sum appropriation is insufficient to a pay *all* the contracts the agency has made." In such cases, "[t]he United States are as much bound by their contracts as are individuals."

<u>Id.</u> at 2189 (citations omitted). Indeed, it repeatedly emphasized that its decision was "[c]onsistent with longstanding principles of Government contracting law . . . ." <u>Id.</u> at 2186; <u>see also id.</u> at 2189 ("This principle safeguards both the expectations of Government contractors and the long-term fiscal interests of the United States."); <u>id.</u> at 2192 (rejecting the dissent's argument as "inconsistent with ordinary principles of Government contracting law").

Plaintiffs, in contrast, rely not on an explicit contract between themselves and defendant, but instead seek payments under the PILT, a program the Federal Circuit has determined is a benefits program. <u>See</u> <u>Greenlee County</u>, 487 F.3d at 879. Thus, <u>Ramah</u> is inapposite.

Plaintiffs attempt to minimize the differences between a contractually based program and a benefits program by arguing that the predictability of payment under the PILT is "critical." Pls.' Resp. 6. The Federal Circuit did not find the "predictability of payment" a reason to depart from the distinction between a contract and a benefits program and neither will this court. Indeed, the difference between a benefits program and a contractually based program is significant, if not determinative, a point plaintiffs recognize:

> It would be equally wrong to do as defendant suggests and apply one rule where an obligation is created "subject to the availability of appropriations" by contract (particularly one to perform work done formerly by the federal government) as in <u>Ramah</u> and <u>Arctic Slope</u> and another rule where, as here, an obligation is created "subject to the availability of appropriations" by statute intended to provide local governments an adequate and predictable level of payment for services that they (not the federal government) provide with respect to federal lands located within their borders.

<u>Id.</u> at 8. This is the precise distinction made by the Federal Circuit in <u>Greenlee County</u> and <u>Star-Glo Associates</u>. Unquestionably, the Court of Federal Claims "is bound to follow Federal Circuit precedent unless 'the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision.'" <u>Red River Coal Co. v. United States</u>, 105 Fed. Cl. 602,

610 (2012) (quoting Strickland v. United States, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005)); see also Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims").  A "trial judge, believing that [prior precedents of a circuit court] contravene a Supreme Court precedent . . . may do no more than criticize those opinions, urging en banc review." Strickland, 423 F.3d at 1338 n.3.  The court sees no basis to criticize Greenlee County and thus follows that decision.  Additionally, the court sees no reason why making a distinction between a contractually based remedy and a benefit program would be, as plaintiffs argue, a "wrong" distinction.  Binding precedent holds the distinction between a contractually based program and qualifying for participation in a benefits program as not equivalent.  Greenlee County, 487 F.3d at 879 (citing Star-Glo Assocs., 414 F.3d at 1355).  Consequently, the "distinction" which defines the parties' relationship to the government is not merely a distinction of form.  Rather, the distinction is determinative of the claims a party may bring against the government for money damages.

Plaintiffs additionally argue that units of general local government are not receiving "gratuitous benefits," but are providing public health, safety, and infrastructure services with respect to federal lands.  However, they do not assert that any program or contract, explicit or implicit, other than the program created by the PILT, entitles them to these funds.  At most, plaintiffs hint that these services constitute an implied-in-fact contract.  To establish the existence of an implied-in-fact contract, plaintiffs must demonstrate the same elements required to establish the existence of an express contract:  mutuality of intent, consideration, unambiguous offer and acceptance, and authority on the part of the government's representative to bind the government.  Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003).  However, plaintiffs failed to allege any of these requirements, except perhaps consideration, have been met in this case.  Consequently, because plaintiffs have not alleged the existence of an implied-in-fact contract in their complaint, the court need not decide whether the provision of services to federal lands has created one.

Plaintiffs finally argue that in Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. 251 (2013), the Court of Federal Claims rejected the argument that the holding of Ramah applies only to the United States' contractual obligations.  Plaintiffs are mistaken.  Indeed, plaintiffs' selectively quote from that decision to support their argument:  "[T]he Supreme Court in its decision in [Ramah] confirmed the full funding mandate, opining that the [ISDA] 'mandates that the Secretary shall pay the full amount of contract support costs incurred by tribes in performing their contracts.'" Id. at 264 (quoting Ramah, 132 S. Ct. at 2186).  But, plaintiffs disregard the language immediately following that which they quote:

> The Supreme Court recognized the model contract and its reference to the [annual funding agreements] as a basis for the full amount of [contract support costs], and found that, "the Government's contractual promise to pay each tribal contractor the 'full amount of funds to which the contractor [was] entitled,' was therefore binding."

Id. (citations omitted).  Thus, it is plain that the Bristol Bay court acknowledged that the

contractual relationship between the tribes and the United States in <u>Ramah</u> was fundamental to the Supreme Court's decision. The court's conclusion here – that plaintiffs participate in a benefits program and are not in privity with the United States – is not therefore inconsistent with the court's reasoning in <u>Bristol Bay</u>. Thus, plaintiffs' complaint fails to state a claim for relief.

Accordingly, the court dismisses Count II of plaintiffs' complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

### C. Plaintiff Greenlee County Is Precluded From Relitigating the PILT Payment Deficiencies

"A fundamental precept of common-law adjudication . . . is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies.'" <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979). The doctrines of res judicata and issue preclusion, also called collateral estoppel, are "central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions." <u>Id.</u> "Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." <u>Id.</u> The doctrine of issue preclusion "serves, in certain circumstances, 'to bar the revisiting of "issues" that have already been fully litigated.'" <u>Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.</u>, 719 F.3d 1367, 1371 (Fed. Cir. 2013) (quoting <u>Jet, Inc. v. Sewage Aeration Sys.</u>, 223 F.3d 1360, 1366 (Fed. Cir. 2000)). A party asserting issue preclusion must establish four elements: "(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." <u>Id.</u> (citing <u>Jet, Inc.</u>, 223 F.3d at 1366).

Plaintiffs contend that issue preclusion "does not apply because . . . there has been a significant change in the law" and they seek recovery for different years than were litigated in the prior case. Pls.' Resp. 8. To the contrary, all four factors are met in this proceeding for plaintiff Greenlee County. The issues are the same as the issues in <u>Greenlee County</u> because both suits were filed by units of general local government seeking payment for the difference between the amounts they should have received under PILT and what they were actually paid. <u>Compare Greenlee County</u>, 487 F.3d at 874, <u>with</u> Compl. ¶¶ 48-56. In addition, the issue in this case was actually litigated in and the determination was necessary to the Federal Circuit's decision in <u>Greenlee County</u>. Indeed, the issue of whether defendant was liable for any PILT shortfall was the only issue presented and decided in <u>Greenlee County</u>. Finally, one of the plaintiffs in this case, Greenlee County, was the same plaintiff in the <u>Greenlee County</u> case and therefore had the opportunity to litigate this issue.

Plaintiffs are correct that issue preclusion "is subject to exceptions when the circumstances dictate." <u>Bingaman v. Dep't of the Treasury</u>, 127 F.3d 1431, 1437 (Fed. Cir. 1997) (citing <u>Montana</u>, 440 U.S. at 162). In particular, "[c]ourts have crafted an exception to the collateral estoppel principle when there has been a change in the applicable law between the time of the original decision and the subsequent litigation in which collateral estoppel is invoked." <u>Id.</u> Plaintiffs argue that this exception applies here because <u>Ramah</u> worked a change in the

applicable law. However, as explained above, the court concludes that there has been no change to the precedential force of <u>Greenlee County</u>, and accordingly this exception does not apply. Plaintiffs also contend that issue preclusion does not apply because the controversy now before the court concerns different payment years. Plaintiffs argument lacks merit. Issue preclusion applies because the factual and legal underpinnings are identical. As the Supreme Court explained in <u>Montana v. United States</u>: "Because the factual and legal context in which the issues of this case arise has not materially altered since [the prior decision], normal rules of preclusion should operate to relieve the parties of "redundant litigation [over] the identical question of the statute's application . . . ." 440 U.S. at 162; <u>see also</u> <u>Jet, Inc.</u>, 223 F.3d at 1366 ("[T]he 'identity of issues' analysis requires inquiry into the actual facts found and presented in the earlier litigation.").

Because all four factors are met with respect to plaintiff Greenlee County and because the court has found that <u>Ramah</u> has not worked a change in the law such that this action falls within an exception to the doctrine of issue preclusion, plaintiff Greenlee County must be dismissed from this case. Moreover, the court need not consider whether plaintiff Prairie County and the rest of the purported class of units of general local government are barred by issue preclusion stemming from the <u>Greenlee County</u> decision. Such an analysis would focus on whether the non-parties to the prior decision were nonetheless privy to or represented in the prior proceeding. <u>See generally</u> <u>Taylor v. Sturgell</u>, 553 U.S. 880, 892-895 (2008) (discussing when a non-party to a prior judgment may still be bound by res judicata or issue preclusion). The parties have provided no background or argument speaking to this point and thus the court need not decide if issue preclusion applies to any party other than Greenlee County. However, even if Prairie County and the members of the purported class were not privy to or represented in <u>Greenlee County</u>, their claims must still be dismissed for failure to state a claim based on the controlling precedent of that decision.

### D. Plaintiffs' Request for Class Action Certification Is Dismissed as Moot

In <u>Greenlee County</u>, the Federal Circuit affirmed the decision of the Court of Federal Claims finding the issue of class certification moot because the cause of action under PILT had been dismissed. 487 F.3d at 880-81. The Federal Circuit noted that it had "repeatedly found on appeal that issues related to class certification were moot in light of [its] resolution against the plaintiff of a motion to dismiss or for summary judgment" and saw "no reason to apply a different rule when it is the Court of Federal Claims that finds the issue moot." <u>Id.</u> at 880.

Count I of the complaint seeks only to certify a class of similarly situated units of general local government. Having dismissed Count II of the complaint, the only claim upon which relief could be granted for any individual plaintiff, the court also dismisses Count I, plaintiffs' request to certify a class, as moot.

### III.  CONCLUSION

For the reasons set forth above, the court **GRANTS** defendant's motion to dismiss and **DISMISSES** plaintiffs' complaint for failure to state a claim upon which relief can be granted. The clerk is directed to enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

# In the United States Court of Federal Claims

No. 12-645C
(Filed: January 14, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| PRAIRIE COUNTY, MONTANA and GREENLEE COUNTY, ARIZONA, | \* |
| | \* |
| | \* |
| Plaintiffs, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER

After a thorough review of plaintiffs' November 26, 2013 motion for reconsideration and defendant's opposition to plaintiffs' motion, filed on January 10, 2014, the court finds, for the reasons set forth in its October 29, 2013 ruling, as well as the reasons explained in defendant's opposition, that plaintiffs' motion fails to articulate adequate grounds to justify this court granting reconsideration under Rule 59 of the Rules of the United States Court of Federal Claims ("RCFC").

As an initial matter, plaintiffs' motion raises arguments for the first time on reconsideration and those arguments are therefore untimely. Plaintiffs' motion fares no better on the merits. The newly raised arguments include plaintiffs' claim that the United States Court of Appeals for the Federal Circuit ("Federal Circuit") committed error in its prior decision in Greenlee County v. United States, 487 F.3d 871 (Fed. Cir. 2007), by incorrectly interpreting and applying dicta in Star-Glo Associates, LP v. United States, 414 F.3d 1349 (Fed. Cir. 2005). Plaintiffs' argument lacks merit. In addition, plaintiffs also claim that the Federal Circuit's decision in Eastern Paralyzed Veterans Ass'n v. Secretary of Veterans Affairs, 257 F.3d 1357 (Fed. Cir. 2001), is the controlling precedent in this case, not the Federal Circuit's 2007 decision in Greenlee County, which raises the identical claims by the same plaintiffs as those in the case at bar. Once again, plaintiffs are incorrect. Indeed, plaintiffs' motion misstates the factual underpinnings and holdings in the three above-cited decisions of the Federal Circuit.

In sum, in addition to being untimely, all of the arguments raised in plaintiffs' motion lack merit; consequently, plaintiffs' motion is denied for failure to satisfy RCFC 59.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

-2-

# STATUTES

### 31 U.S.C. § 6902(a)(1)

**(a)(1)** Except as provided in paragraph (2), the Secretary of the Interior shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located as set forth in this chapter. A unit of general local government may use the payment for any governmental purpose.

…

### 31 U.S.C. § 6903

**(a)** In this section--

**(1)** "payment law" means--

**(A)** the Act of June 20, 1910 (ch. 310, 36 Stat. 557);

**(B)** section 33 of the Bankhead-Jones Farm Tenant Act (7 U.S.C. § 1012);

**(C)** the Act of May 23, 1908 (16 U.S.C. § 500) or the Secure Rural Schools and Community Self-Determination Act of 2000;

**(D)** section 5 of the Act of June 22, 1948 (16 U.S.C. §§ 577g, 577g-1);

**(E)** section 401(c)(2) of the Act of June 15, 1935 (16 U.S.C. § 715s(c)(2));

**(F)** section 17 of the Federal Power Act (16 U.S.C. § 810);

**(G)** section 35 of the Act of February 25, 1920 (30 U.S.C. § 191);

**(H)** section 6 of the Mineral Leasing Act for Acquired Lands (30 U.S.C. § 355);

**(I)** section 3 of the Act of July 31, 1947 (30 U.S.C. § 603); and

**(J)** section 10 of the Act of June 28, 1934 (known as the Taylor Grazing Act) (43 U.S.C. § 315i).

**(2)** population shall be determined on the same basis that the Secretary of Commerce determines resident population for general statistical purposes.

**(3)** a unit of general local government may not be credited with a population of more than 50,000.

**(b)(1)** A payment under section 6902 of this title is equal to the greater of—

    **(A)** 93 cents during fiscal year 1995, $1.11 during fiscal year 1996, $1.29 during fiscal year 1997, $1.47 during fiscal year 1998, and $1.65 during fiscal year 1999 and thereafter, for each acre of entitlement land located within a unit of general local government (but not more than the limitation determined under subsection (c) of this section) reduced (but not below 0) by amounts the unit received in the prior fiscal year under a payment law; or

    **(B)** 12 cents during fiscal year 1995, 15 cents during fiscal year 1996, 17 cents during fiscal year 1997, 20 cents during fiscal year 1998, and 22 cents during fiscal year 1999 and thereafter, for each acre of entitlement land located in the unit (but not more than the limitation determined under subsection (c) of this section).

**(2)** The chief executive officer of a State shall submit to the Secretary of the Interior a statement on the amounts of payments the State transfers to each unit of general local government in the State out of amounts received under a payment law.

**(c)(1)** The limitation for a unit of general local government with a population of not more than 4,999 is the highest dollar amount specified in paragraph (2).

**(2)** The limitation for a unit of general local government with a population of at least 5,000 is the following amount (rounding the population off to the nearest thousand):

| If population equals-- | the limitation is equal to the population times -- |
|---|---|
| 5,000 | $110.00 |
| 6,000 | 103.00 |
| 7,000 | 97.00 |

| | |
|---|---|
| 8.000 | 90.00 |
| 9,000 | 84.00 |
| 10,000 | 77.00 |
| 11,000 | 75.00 |
| 12,000 | 73.00 |
| 13,000 | 70.00 |
| 14,000 | 68.00 |
| 15,000 | 66.00 |
| 16,000 | 65.00 |
| 17,000 | 64.00 |
| 18,000 | 63.00 |
| 19,000 | 62.00 |
| 20,000 | 61.00 |
| 21,000 | 60.00 |
| 22,000 | 59.00 |
| 23,000 | 59.00 |
| 24,000 | 58.00 |
| 25,000 | 57.00 |
| 26,000 | 56.00 |
| 27,000 | 56.00 |

| | |
|---|---|
| 28,000 | 56.00 |
| 29,000 | 55.00 |
| 30,000 | 55.00 |
| 31,000 | 54.00 |
| 32,000 | 54.00 |
| 33,000 | 53.00 |
| 34,000 | 53.00 |
| 35,000 | 52.00 |
| 36,000 | 52.00 |
| 37,000 | 51.00 |
| 38,000 | 51.00 |
| 39,000 | 50.00 |
| 40,000 | 50.00 |
| 41,000 | 49.00 |
| 42,000 | 48.00 |
| 43,000 | 48.00 |
| 44,000 | 47.00 |
| 45,000 | 47.00 |
| 46,000 | 46.00 |
| 47,000 | 46.00 |

| | |
|---|---|
| 48,000....................................................................... | 45.00 |
| 49,000....................................................................... | 45.00 |
| 50,000....................................................................... | 44.00 |

**(d)** On October 1 of each year after the date of enactment of the Payment in Lieu of Taxes Act, the Secretary of the Interior shall adjust each dollar amount specified in subsections (b) and (c) to reflect changes in the Consumer Price Index published by the Bureau of Labor Statistics of the Department of Labor, for the 12 months ending the preceding June 30.

…

## 31 U.S.C. § 6906

For each of fiscal years 2008 through 2013—

(1) each county or other eligible unit of local government shall be entitled to payment under this chapter; and

(2) sums shall be made available to the Secretary of the Interior for obligation or expenditure in accordance with this chapter.

…

## 31 U.S.C. §1341(a)(1)(A), (B)

(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—

   (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;

   (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law;

…

Third Edition
# A Glossary Of
# Terms Used In The
# Federal Budget Process

And Related Accounting, Economic, and Tax Terms

March 1981

United States General Accounting Office
Washington, D.C.
PAD-81-27

—acquisition of guaranteed private loans or collateral in satisfaction of default or other guarantee claims.

For informational purposes, transactions similar to direct loans are sometimes displayed in the budget. For example:

—sale of Federal assets on credit terms for more than 90 days duration;

—investments in obligations or preferred stock of any privately owned enterprises; and,

—deferred or delinquent interest that is capitalized.

Direct loans, unlike loan guarantees, are included (net of repayments) as outlays in the budget. For a more detailed discussion, see Federal Credit Programs in Special Analysis F of the *Special Analyses, Budget of the United States Government.* *(See also* Loan Guarantee; Loan Insurance.)

## ENTITLEMENTS

Legislation that requires the payment of benefits (or entitlements) to any person or unit of government that meets the eligibility requirements established by such law. Authorizations for entitlements constitute a binding obligation on the part of the Federal Government, and eligible recipients have legal recourse if the obligation is not fulfilled. Budget authority for such payments is not necessarily provided in advance, and thus entitlement legislation requires the subsequent enactment of appropriations unless the existing appropriation is permanent. Examples of entitlement programs are social security benefits and veterans compensation or pensions. Section 401(b) of the Congressional Budget and Impoundment Control Act of 1974 (P.L. 93-344, 31 U.S.C. 1351(b)) imposes certain limits on the use of entitlements. *(See also* Authorizing Legislation; Controllability; Spending Authority; Spending Legislation.)

## EXCHANGE OF ASSETS

The movement of money between the International Monetary Fund (IMF), or similar organizations, and the Department of Treasury.

57



GAO

Accountability * Integrity * Reliability

United States Government Accountability Office

# A Glossary of Terms Used in the Federal Budget Process

September 2005

Add.21

**Terms and Definitions**



# O

## Object Classification

A uniform classification identifying the obligations of the federal government by the types of goods or services purchased (such as personnel compensation, supplies and materials, and equipment) without regard to the agency involved or the purpose of the programs for which they are used. If the obligations are in a single object classification category, the classification is identified in the Program and Financing Schedule in the President's budget. For the activities distributed among two or more object classification categories, the budget has a separate object classification schedule to show the distribution of the obligations by object classification. See also Explanation of Estimates in the "Detailed Budget Estimates" section of the President's budget. General instructions are provided in OMB Circular No. A-11, revised. (*See also* Allocation. For a distinction, *see* Functional Classification.)

## Obligation

A definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States. Payment may be made immediately or in the future. An agency incurs an obligation, for example, when it places an order, signs a contract, awards a grant, purchases a service, or takes other actions that require the government to make payments to the public or from one government account to another. The standards for the proper reporting of obligations are found in section 1501(a) of title 31 of the *United States Code*. See also OMB Circular No. A-11.

## Obligation Limitation

*See under* Limitation.

Add.22

**United States Government Accountability Office**



Office of the General Counsel

---

February 2006

# Principles of Federal Appropriations Law

## Third Edition

## Volume II

This volume supersedes the Volume II, Second Edition of the Principles of Federal Appropriations Law, 1992.

On August 6, 2010, the web versions of the Third Edition of the Principles of Federal Appropriations Law, Volumes I, II and III, were reposted to include updated active electronic links to GAO decisions. Additionally, the Third Edition's web based Index/Table of Authorities (Index/TOA) was replaced by an Index/TOA that incorporated information from Volume I, II and III. These four documents can be used independently or interactively. To use the documents interactively, click on http://www.gao.gov/special.pubs/redbook1.html and you will be directed to brief instructions regarding interactive use.

The Security of this file is set to prevent a situation where linked references are appended to the PDF. If this change prevents an Acrobat function you need (e.g., to extract pages), use the the password "redbook" to revise the document security and enable the additional functions.



---

GAO-06-382SP

> that expressly or impliedly authorizes the otherwise
> unauthorized action. While legislative history may be useful
> to clarify an ambiguity in legislative language, one may not
> refer to the legislative history to write into the law that
> which is not there. 55 Comp. Gen. 307, 325 (1975). The
> District would have us write into the language of the law
> something that is not even mentioned in the relevant
> committee reports."

The treatment of lump-sum appropriations as described above has been
considered by the courts as well as GAO, and they reached the same
result.[18] The United States Court of Appeals for the District of Columbia
Circuit noted that lump-sum appropriations have a "well understood
meaning" and stated the rule as follows:

> "A lump-sum appropriation leaves it to the recipient agency
> (as a matter of law, at least) to distribute the funds among
> some or all of the permissible objects as it sees fit."

*International Union v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984), *cert.
denied*, 474 U.S. 825 (1985). The court in that case refused to impose a
"reasonable distribution" requirement on the exercise of the agency's
discretion, and found that discretion unreviewable. *Id.* at 862–63. *See also
McCarey v. McNamara*, 390 F.2d 601 (3rd Cir. 1968); *Blackhawk Heating &
Plumbing Co. v. United States*, 622 F.2d 539, 547 n.6 (Ct. Cl. 1980).

One court, at odds with the weight of authority, concluded that an agency
was required by 31 U.S.C. § 1301(a) (purpose statute) to spend money in
accordance with an earmark appearing only in legislative history. *Blue
Ocean Preservation Society v. Watkins*, 767 F. Supp. 1518 (D. Haw. 1991).

The Supreme Court's 1993 decision in *Lincoln v. Vigil*, 508 U.S. 182, put to
rest any lingering uncertainty that might have existed on this point. Writing
for a unanimous Court, Justice Souter quoted the rule stated in the *LTV*

---

[18] The Justice Department's Office of Legal Counsel also reached the same conclusion. *See,
e.g.*, Memorandum for the General Counsel, United States Marshals Service, *USMS
Obligation to Take Steps To Avoid Anticipated Appropriations Deficiency*, OLC Opinion,
May 11, 1999; 16 Op. Off. Legal Counsel 77 (1992); 4B Op. Off. Legal Counsel 702 (1980);
4B Op. Off. Legal Counsel 674 (1980).

Add.24

fate of the contractor seems to depend on the type of appropriation involved and the presence or absence of notice, actual or constructive, to the contractor on the limitations of the appropriation.

Where a contractor is but one party out of several to be paid from a general appropriation, the contractor is under no obligation to know the status or condition of the appropriation account on the government's books. If the appropriation becomes exhausted, the Antideficiency Act may prevent the agency from making any further payments, but valid obligations will remain enforceable in the courts. For example, in *Ferris v. United States*, 27 Ct. Cl. 542 (1892), the plaintiff had a contract with the government to dredge a channel in the Delaware River. The Corps of Engineers made him stop work halfway through the job because it had run out of money. In discussing the contractor's rights in a breach of contract suit, the court said:

> "A contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects. An appropriation *per se* merely imposes limitations upon the Government's own agents; it is a definite amount of money entrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties."

*Id.* at 546.

The rationale for this rule is that "a contractor cannot justly be expected to keep track of appropriations where he is but one of several being paid from the fund." *Ross Construction Corp. v. United States*, 392 F.2d 984, 987 (Ct. Cl. 1968). Other illustrative cases are *Dougherty ex rel. Slavens v. United States*, 18 Ct. Cl. 496 (1883), and *Joplin v. United States*, 89 Ct. Cl. 345 (1939). The Antideficiency Act may "apply to the official, but [does] not affect the rights in this court of the citizen honestly contracting with the Government." *Dougherty*, 18 Ct. Cl. at 503. Thus, it is settled that contractors paid from a general appropriation are not barred from recovering for breach of contract even though the appropriation is exhausted.

obligational duration of the appropriation.[51]  This is because the current appropriation is not available for future needs, and appropriations for those future needs have not yet been made.  Citations to support this proposition are numerous.[52]  The rule applies to any attempt to obligate the government beyond the end of the fiscal year, even where the contract covers a period of only a few months.  24 Comp. Gen. 195 (1944).

An understanding of the principles applicable to multiyear contracting begins with a discussion of a 1926 decision of the United States Supreme Court.  An agency had entered into a long-term lease for office space with 1-year (*i.e.*, fiscal year) funds, but its contract specifically provided that payment for periods after the first year was subject to the availability of future appropriations.  In *Leiter v. United States*, 271 U.S. 204 (1926), the Supreme Court specifically rejected that theory.  The Court held that the lease was binding on the government only for one fiscal year, and it ceased to exist at the end of the fiscal year in which the obligation was incurred.  It takes affirmative action to bring the obligation back to life.  The Court stated its position as follows:

> "It is not alleged or claimed that these leases were made under any specific authority of law.  And since at the time they were made there was no appropriation available for the payment of rent after the first fiscal year, it is clear that in so far as their terms extended beyond that year they were in violation of the express provisions of the [Antideficiency Act]; and, being to that extent executed without authority of law, they created no binding obligation against the United States after the first year.  [Citations omitted.]  A lease to the Government for a term of years, when entered into under an appropriation available for but one fiscal year, is binding on the Government only for that year.  [Citations omitted.]  And it is plain that, to make it binding for any subsequent year, it is necessary, not only that an appropriation be made

---

[51] Every violation of the *bona fide* needs rule does not necessarily violate the Antideficiency Act as well.  Determinations must be made on a case-by-case basis.  71 Comp. Gen. 428, 431 (1992); B-235086.2, Jan. 22, 1992 (nondecision letter).

[52] *E.g.*, 67 Comp. Gen. 190 (1988); 66 Comp. Gen. 556 (1987); 61 Comp. Gen. 184, 187 (1981); 48 Comp. Gen. 471, 475 (1969); 42 Comp. Gen. 272 (1962); 37 Comp. Gen. 60 (1957); 36 Comp. Gen. 683 (1957); 33 Comp. Gen. 90 (1953); 29 Comp. Gen. 91 (1949); 27 Op. Att'y Gen. 584 (1909).

with renewal options, the fact that funds become available in subsequent years does not place the government under an obligation to exercise the renewal option. *Government Systems Advisors, Inc. v. United States*, 13 Cl. Ct. 470 (1987), *aff'd*, 847 F.2d 811 (Fed. Cir. 1988).[56]

Note that, in *Leiter*, the inclusion of a contract provision conditioning the government's obligation on the subsequent availability of funds was to no avail. In this regard, see also 67 Comp. Gen. 190, 194 (1988); 42 Comp. Gen. 272, 276 (1962); 36 Comp. Gen. 683 (1957). If a "subject to availability" clause were sufficient to permit multiyear contracting, the effect would be automatic continuation from year to year unless the government terminated. If funds were not available and the government nevertheless permitted or acquiesced in the continuation of performance, the contractor would obviously be performing in the expectation of being paid.[57] Apart from questions of legal liability, the failure by Congress to appropriate the money might be viewed as a serious breach of faith. Congress, as a practical if not a legal matter, would have little real choice but to appropriate funds to pay the contractor. This is another example of a type of "coercive deficiency" the Antideficiency Act was intended to prohibit.[58] Thus, it is not enough for the government to retain the option to terminate at any time if sufficient funds are not available. Under *Leiter* and its progeny, the contract "dies" at the end of the fiscal year, and may be revived only by affirmative action by the government. This "new" contract is then chargeable to appropriations for the subsequent year.

Although today FASA and the Federal Acquisition Regulation recognize "subject to availability" clauses, such a clause, by itself, is not sufficient. FASA provides that a multiyear contract for purposes of FASA—

> "may provide that performance under the contract during
> the second and subsequent years of the contract is

---

[56] The Claims Court based its conclusion in part on *Leiter* and the Antideficiency Act; the Federal Circuit relied on the language of the contract.

[57] The Federal Acquisition Regulation states that encouraging a contractor to continue performance in the absence of funds violates the Antideficiency Act. 48 C.F.R. § 32.704(c) (2005). In this regard, section C.3 of this chapter discusses how the Antideficiency Act's prohibition against acceptance of voluntary services, 31 U.S.C. § 1342, prohibits contracting officers from soliciting or permitting a contractor to continue performance on a "temporarily unfunded" basis.

[58] See section C.1 of this chapter for a discussion of the coercive deficiency concept.

Add.27

> contingent upon the appropriation of funds and (if it does so
> provide) may provide for a cancellation payment to be made
> to the contractor if such appropriations are not made."

41 U.S.C. § 254c(d). If an agency decides to include a "subject to
availability" clause for the second and subsequent years, the agency also
has to provide for possible termination. Availability clauses are required by
the Federal Acquisition Regulation in several situations. While the
prescribed contract clauses vary in complexity, they all have one thing in
common—each requires the contracting officer to specifically notify the
contractor in writing that the contractor may resume performance. For
example: (1) contract actions initiated prior to the availability of funds;[59]
(2) certain requirements and indefinite-quantity contracts;[60] (3) fully funded
cost-reimbursement contracts;[61] (4) facilities acquisition and use;[62] and
(5) incrementally funded cost-reimbursement contracts.[63] *See* 48 C.F.R.
subpt. 32.7. The objective of these clauses is compliance with the
Antideficiency Act and other fiscal statutes. *See ITT Federal Laboratories*,
ASBCA No. 12987, 69-2 BCA ¶ 7,849 (1969), *rev'd and remanded on other
grounds*, *ITT v. United States*, 453 F.2d 1283 (1972). What is not sufficient
is a simple "subject to availability" clause which would permit automatic
continuation subject to the government's right to terminate.

In B-259274, May 22, 1996, the Air Force exercised an option to a severable
service contract that extended the contract from September 1, 1994, to
August 31, 1995, using fiscal year 1994 funds.[64] However, the Air Force only
had enough fiscal year 1994 budget authority to finance 4 months of the
option period, leaving the remaining 8 months unfunded. The Air Force
modified the agreement by adding a clause stating that the government's
obligation beyond December 31, 1994, was subject to the availability of
appropriations. Significantly, however, the clause further stated that no

---

[59] Availability of Funds, 48 C.F.R. § 52.232-18.

[60] Availability of Funds for the Next Fiscal Year, 48 C.F.R. § 52.232-19.

[61] Limitation of Cost, 48 C.F.R. § 52.232-20.

[62] Limitation of Cost (Facilities), 48 C.F.R. § 52.232-21.

[63] Limitation of Funds, 48 C.F.R. § 52.232-22.

[64] See section B.9.a of Chapter 5 for a discussion of severable service contracts that cross
fiscal years.

Add.28

United States Government Accountability Office



United States Government Accountability Office

Office of the General Counsel

March 2014

# PRINCIPLES OF FEDERAL APPROPRIATIONS LAW

# Annual Update of the Third Edition



Mar. 25, 2002; 53 Comp. Gen 853, 856 (1974); B-208593.6, Dec. 22, 1988. *See* **B-307720, Sept. 27, 2007,** and B-258000, Aug. 31, 1994, for examples of harmonizing ambiguous appropriation and authorization provisions in order to effectuate congressional intent.

Page 2-44 – *Replace the second full paragraph with the following:*

Third, if two statutes are in irreconcilable conflict, the more recent statute, as the latest expression of Congress, governs. As one court concluded in a statement illustrating the eloquence of simplicity, "[t]he statutes are thus in conflict, the earlier permitting and the later prohibiting," so the later statute supersedes the earlier. *Eisenberg v. Corning*, 179 F.2d 275, 277 (D.C. Cir. 1949). In a sense, the "last in time" rule is yet another way of expressing the repeal by implication principle. We state it separately to highlight its narrowness: it applies only when the two statutes cannot be reconciled in any reasonable manner, and then only to the extent of the conflict. *E.g.,* **B-308715, Apr. 20, 2007 ("It is well established that a later enacted, specific statute will typically supersede a conflicting previously enacted, general statute to the extent of the inconsistency.").** *See also Posadas*, 296 U.S. at 503; **B-255979, Oct. 30, 1995;** B-226389, Nov. 14, 1988; B-214172, July 10, 1984, *aff'd upon reconsideration,* 64 Comp. Gen 282 (1985).

Page 2-49 – *Replace the last full paragraph with the following*:

Thus, appropriating less than the amount of a nonvested mandatory authorization, including not appropriating any funds for it, will be effective under the "last in time" rule as long as the intent to suspend or repeal the authorization is clear. However, by virtue of the rule against repeal by implication, a mere failure to appropriate sufficient funds will not be construed as amending or repealing prior authorizing legislation. ***See, e.g., In re Aiken County,* 725 F.3d 255, 260 (D.C. Cir. 2013).**

**Page 2-50** – *Replace the second paragraph with the following:*

**The Supreme Court determined that the "subject to the availability of appropriations" language conditions the Act's entitlement, but that condition is fulfilled when Congress appropriates "sufficient legally unrestricted" funds to meet its Indian Self-Determination and Education Assistance Act obligations "even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made." *Cherokee Nation of Oklahoma v. Leavitt,***

543 U.S. 631, 637 (2005). ***Cherokee Nation*** **addressed a lump sum appropriation. In a later case, the Court addressed a lump sum appropriation that included a "not to exceed" proviso. The Court held that the Act requires the government to pay the full amount of contract support costs, notwithstanding the "not to exceed" amount, as long as "Congress appropriated adequate funds to pay in full any individual contractor." *Salazar v. Ramah Navajo Chapter*, 567 U.S. ___, 132 S. Ct. 2181, 2191 (2012).**

**Page 2-53** – *Replace the last full paragraph with the following:*

By 1971, however, Congress was enacting (and continues to enact) a general provision in all appropriation acts: "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein." Now, if an appropriation act contains the provision quoted in the preceding paragraph, it will not be sufficient for an appropriation contained in that act to merely incorporate a multiple year or no-year authorization by reference. The effect of this general provision is to require the appropriation language to expressly provide for availability beyond one year in order to overcome the enacting clause. **B-319734, July 26, 2010; 50 Comp. Gen 857 (1971).**

**Page 2-56** – *Replace the second full paragraph with the following:*

For purposes of the rule of 50 Comp. Gen 857 and its progeny, it makes no difference whether the authorization is in an annual authorization of appropriations act or in permanent enabling legislation. It also appears to make no difference whether the authorization merely authorizes the longer period of availability or directs it. See, for example, 58 Comp. Gen 321, in which the general provision restricting availability to the current fiscal year, as the later expression of congressional intent, was held to override 25 U.S.C. § 13a, which provides that the unobligated balances of certain Indian assistance appropriations "shall remain available for obligation and expenditure" for a second fiscal year. *See also* B-319734, July 26, 2010; 71 Comp. Gen 39, 40 (1991); B-249087, June 25, 1992. Similarly, in *Dabney v. Reagan*, No. 82 Civ. 2231-CSH (S.D. N.Y. June 6, 1985), the court held that a two-year period of availability specified in appropriation acts would override a "mandatory" no-year authorization contained in the Solar Energy and Energy Conservation Bank Act.

B- 239435 (Comp.Gen.), 1990 WL 10007871

COMPTROLLER GENERAL

The Honorable Alan Cranston
Chairman, Committee on Veterans' Affairs
United States Senate

August 24, 1990

Dear Mr. Chairman:

**\*1** This is in response to your letter dated April 17, 1990, and co-signed by Senator Murkowski, Chairman Montgomery, and Representative Stump, asking whether the Office of Management and Budget's (OMB) new policy regarding "scoring" of lease-purchase agreements precludes the Department of Veterans Affairs (DVA) from issuing invitations for offers for VA regional office collocations as required by section 603 of the Veterans' Benefits Amendments of 1989, Public Law 101-237, 103 Stat. 2095 (1989) (codified at 38 U.S.C. § 230). As explained below, we conclude that OMB's scoring policy does not preclude DVA from issuing invitations for offers for collocation lease-purchase agreements. In our opinion, VA has the authority, albeit limited, to enter into lease-purchase agreements subject to the enactment of appropriations.

BACKGROUND

As you know section 603 of the Veterans' Benefits Amendments of 1989, 38 U.S.C. § 230(c), requires the Secretary of Veterans Affairs to provide for the collocation of at least three regional offices with DVA medical centers. The law authorizes the Secretary to lease land under the DVA's jurisdiction to a third party which in turn will construct a facility for regional offices and lease it back to the DVA. 38 U.S.C. § 230(c)(2)(A). The law further authorizes the Secretary to enter into a lease of no more than 35 years for such facility, at the end of which time ownership of the facility shall vest in the United States. 38 U.S.C. § 230(c)(3). The law directs that the lease-purchase agreement contain a provision that "the obligation of the United States to make payments under the agreement is subject to the availability of appropriations for that purpose". Id. The Secretary must issue invitations for offers with respect to the three collocations within 120 days of the enactment of the law (the law was enacted on December 18, 1989). 38 U.S.C. § 230(c)(6). The statute contains a nearly identical mandate for the Secretary to acquire medical facilities by lease-purchase. 38 U.S.C. § 5003(d).

According to your letter, a new OMB policy requires that agencies "score" lease-purchase agreements in the same manner as outright government purchases. Under the new policy, agencies may enter into lease-purchase agreements only if they have sufficient appropriations to cover the full estimated cost of the lease-purchase project. Since DVA does not currently have sufficient appropriations to cover the full costs of the lease-purchase agreements for collocations, you state that the OMB policy effectively precludes DVA from issuing invitations for bids for the three collocations.

**\*2** By letter dated July 11, 1990, OMB informed us that the new policy is designed to fully disclose the true costs of acquiring buildings, as capital assets, by lease-purchase.[1] OMB states that the Antideficiency Act prohibits government officers from entering into obligations for leases and

multi-year contracts in excess of appropriations or funds available "unless such contract is authorized by law". Such authority is typically provided as contract or borrowing authority. It is OMB's view that the DVA statute does not create "contract authority" because it specifically states that the obligation of the United States to make payments under the lease-purchase agreements shall be "subject to the availability of appropriations for that purpose". The DVA statute does not authorize an unconditional obligation nor does it provide budgetary resources. Thus, OMB argues that DVA can not obligate the government until moneys are appropriated. In sum, it is OMB's position that the lack of budgetary resources, rather than the new policy, prevents DVA from entering into the collocation agreements.

BUDGET SCORING

We have defined scorekeeping as the process of tracking the status and fiscal impact of congressional budgetary actions. Examples of scorekeeping information include such data as up-to-date tabulations and reports on congressional actions affecting budget authority, receipts, outlays, surplus, or deficit and the public debt limit, as well as outlay and receipt estimates and reestimates. GAO, A Glossary of the Terms Used in Federal Budget Process 76 (March 1981). Scorekeeping is significant not simply for the information it provides on the budgetary consequences of congressional actions, but also because of its impact on the budgetary decisionmaking of the Congress under the procedures set forth in the Congressional Budget Act of 1974, as amended, 2 U.S.C. § 631.[2] However, once authorization or appropriation legislation is enacted, the statute, rather than budget scoring, controls agency actions. In our opinion, OME's scoring policy does not affect the authority otherwise granted to DVA by the Congress. Thus, we think the issue is more properly focused on the nature of the transaction Congress authorized the DVA to execute under section 603 of the 1989 Veterans' Amendments, not on how OMB and CBO propose to score the transaction.

DVA AUTHORITY TO LEASE-PURCHASE

The collocation statute provides that:
    "(3)(A) The Secretary may enter into a lease [for the collocated regional facility] . . . for not more than 35 years under such terms and conditions as may be in the best interests of the Department . . ..

    (B) Each agreement to lease a facility . . . shall include a provision that -

    (i) the obligation of the United States to make payments under the agreement is subject to the availability of appropriations for that purpose; and

    **3** (ii) the ownership of such facility shall vest in the United States at the end of such lease."

38 U.S.C. § 230(c).

Under the Antideficiency Act, an officer of the United States is prohibited from making expenditures or incurring obligations in excess of or in advance of available appropriations. 31 U.S.C. § 1341(a). This general prohibition does not apply if the expenditure or obligation is otherwise "authorized by law". 31 U.S.C. § 1341(a). Such authority is typically granted in the form of "contract authority," which is the authority to contractually obligate the United States to future payments even though no appropriations are available to pay the obligations at the time the contract is made. See 62 Comp. Gen. 361, 365 (1983);

28 Comp. Gen. 163 (1948).

However, we agree with OMB that section 603 does not grant DVA this kind of contract authority. Paragraph (3)(B) specifies that any obligation of the United States under the collocation agreement must be "subject to the availability of appropriations for that purpose." This provision, in our view, clearly indicates that the Congress does not intend to authorize the Secretary to obligate the United States to future payments under the agreements prior to the enactment of appropriations to pay for them.

At the same time, it is clear from the statute that the Congress intended the DVA to enter into collocation agreements. The statutory language is mandatory rather than permissive. It states that the Secretary (1) "shall provide for the collocation of at least three regional offices with medical centers," (39 U.S.C. § 230(c)(1)), (2) "shall, within 120 days of the enactment of this subsection, issue an invitation for offers with respect to three collocations to be carried out under this subsection," (39 U.S.C. § 230(c)(6)(A)), and (3) "shall" enter into an agreement to carry out one of the collocations within one year of issuing the invitation and agreements to carry out two other collocations within 180 days of the first agreement, (38 U.S.C. § 230(c)(6)(B)). There is also considerable legislative history indicating that the Congress intended the collocations to begin as rapidly as possible. See H.R. Rep. No. 262, 101st Cong., 1st Sess. 12-18 (1989).

We have recognized that in certain instances an agency may enter into a contract that is binding on the United States only to the extent of future appropriations to cover it. See 39 Comp. Gen, 340, 342 (1959). Such a contract specifically provides that the government's liability is contingent on the availability of appropriations, and obligations under it do not arise until appropriations are enacted. Id. In our opinion this is the type of contract that the collocation provision authorizes. Specifically, the law authorizes the DVA to enter into 35 year agreements under which the United States will be obligated to make payments only when, and to the extent that, appropriations are enacted for this purpose. Since these agreements will obligate the United States only to the extent appropriations are enacted, the DVA does not need budget authority sufficient to cover the full 35 year cost of the agreement before inviting offers and awarding the contract.

**\*4** In our opinion this conclusion is not inconsistent with the Supreme Court decision in Leiter v. United States, 271 U.S. 204 (1925). In Leiter, the Court decided that an agency that entered into a multi-year space lease providing that payment for periods beyond the first year was contingent on the availability of future appropriations violated the Antideficiency Act because the lease was not specifically authorized by statute. 271 U.S. at 207. Leiter is not applicable in this case because DVA does have specific statutory authority to enter into 35 year agreements contingent on the future availability of appropriations.

Thus, we conclude that DVA is presently authorized to issue invitations for offers and to enter into 35 year lease-purchase contracts that are binding upon the United States only to the extent that appropriations are made available for that purpose in the future. We reach a similar conclusion with respect to the acquisition of medical facilities authorized by 30 U.S.C. § 5003(d).

Because payments under any lease-purchase agreement would be dependent upon the availability of appropriations for that purpose, it is useful to consider briefly whether any appropriation is currently available to pay for the collocation lease-purchases. DVA receives two appropriations that logically

Honorable Alan Cranston, B- 239435 (1990)

could be used to make collocation lease payments. One is the DVA's General Operating Expenses (GOE) appropriation account which, as you point out, has been used in the past to pay fair market value rents for General Services Administration controlled space on an annual basis. The other is the DVA's "Construction, Major Projects" appropriation.

Although the GOE appropriation is available for "necessary operating expenses"[3] of the VA, we do not view that appropriation as presently available to pay the costs of the collocation lease-purchases. We view the collocation transactions not merely as leases, generally payable out of operating funds, but lease-purchases, the ultimate purpose of which is to finance the construction and acquisition of regional offices. The fact that the cost of construction and acquisition is covered through lease payments is not significant. In other words, the transactions are more akin to construction/ acquisition than a lease of a facility, the only difference being that a financing method other than direct appropriations from the Treasury is used.

Further, it appears to us that Congress views the major construction appropriation as the proper one to charge with lease-purchase construction costs. As we noted earlier, section 603(b) of the Veterans' Benefits Amendments of 1989, codified at 38 U.S.C. § 5003, authorizes the same type of lease-purchase transactions for medical centers as section 603(a) does for the collocation of regional offices with medical centers. The fiscal year 1990 appropriation for DVA appropriates construction funds out of the "Construction, Major Projects" account for any of the purposes set forth in 38 U.S.C. § 5003, which would include the authority to develop medical centers through lease-purchase transactions. Similarly in the Senate version of the bill that provided for DVA appropriations for fiscal year 1990, the Senate proposed to fund several lease-purchase construction projects out of the DVA's "Construction, Major Projects" appropriation.[4] See H.R. 2916 (101st Cong.), with Senate amendments, September 28, 1989. These congressional actions suggest that the Congress has to date viewed the "Construction, Major Projects" rather than the GOE appropriation account as the appropriate funding source for lease-purchases.

**\*5** The 1990 DVA appropriation contains a provision that bars the use of major construction funds for "any project which has not been considered and approved by the Congress in the budgetary process . . .." Pub. L. No. 101-144, 103 Stat. 842 (1989) and H.R. 5158 (101st Cong.), June 26, 1991. The DVA collocation projects have not been through this process and thus amounts appropriated for major construction for fiscal year 1990 are not available for these projects. Therefore, we conclude that no appropriation is currently available to charge collocation construction/lease-purchase costs. Whether any future appropriation is available for this purpose will, of course, depend upon the terms of that appropriation.

We trust that this opinion is responsive to your needs. As agreed by your staff, unless you announce its contents earlier, this opinion will be available to the public 5 days from today.
 Sincerely yours,

Milton J. Socolar
for Comptroller General of the United States


Footnotes

1      We understand that the Congressional Budget Office (CBO) agrees with OMB's new policy.

2      The Congressional Budget Act, 2 U.S.C. § 639(b), requires CBO to produce periodic scorekeeping reports. Scoring, however, is not done pursuant to any statutory or written rules.

3      The GOE appropriation covers the administration of nonmedical veterans benefits through the Veterans Benefits Administration, operation and maintenance of 144 cemeterial activities by the National Cemetery System and for top management direction and support. H.R. Rep. No. 150, 101st Cong., 1st Sess. 10 (1989); S. Rep. No. 128, 101st Cong., 1st Sess. 19 (1989).

4      The lease-purchase language was deleted by the Conference Committee. H.R. Rep. No. 297, 101st Cong., 1st Sess. 9 (1989).

B- 239435 (Comp.Gen.), 1990 WL 10007871

**End of Document**                                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of June 2014, I served via the Court's

electronic filing system, the foregoing **Plaintiffs-Appellants' Initial Brief** on the

following individual:

> Sharon A. Snyder
> U.S. Department of Justice
> Commercial Litigation Branch
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C. 20044
> (202) 616-0347
> (202) 514-7969 – Fax
> email: [Sharon.Snyder@usdoj.gov](mailto:Sharon.Snyder@usdoj.gov)
>
> Counsel for Defendant-Appellee

s/*Alan I. Saltman*
Alan I. Saltman

**CERTIFICATE OF COMPLIANCE**
PURSUANT TO FED. R. APP. 32(a)(7)(C)
for Case No. 2014-5060

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C), the attached principal

brief of Plaintiffs-Appellants is proportionately spaced, has a typeface of 14 points

or more and contains 9,706 words.


By:    *Alan I. Saltman*
        Alan I. Saltman
        SMITH, CURRIE & HANCOCK LLP
        1025 Connecticut Avenue, N.W.
        Suite 600
        Washington, D.C. 20036
        (202) 452-2140
        (202) 775-8217 – Fax
        email: AISaltman@smithcurrie.com

        Counsel for Plaintiffs-Appellants

Dated:   June 20, 2014